IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA16-566

 Filed: 20 June 2017

Mecklenburg County, No. 14 CRS 229990

STATE OF NORTH CAROLINA

 v.

SAM BABB CLONTS, III

 Appeal by Defendant from judgment entered 19 June 2015, and orders entered

19 June 2015 and 29 February 2016, by Judge Jeffrey P. Hunt in Superior Court,

Mecklenburg County. Heard in the Court of Appeals 9 January 2017.

 Attorney General Joshua H. Stein, by Assistant Attorney General Kathleen N.
 Bolton, for the State.

 Hale Blau & Saad Attorneys at Law, P.C., by Daniel M. Blau, for Defendant.

 McGEE, Chief Judge.

 I. Factual Basis and Trial

 A. 28 July 2014

 Sam Babb Clonts, III (“Defendant”) shot Aaron Brandon Allen (“Allen”) on the

evening of 28 July 2014. Defendant and Allen became friends while training together

prior to deployment to Afghanistan; Defendant was in the Navy and Allen was in the

Marine Corps. During their time together in Afghanistan, they became “almost like

brothers.” Allen left the military in 2011 and moved back to Mint Hill, North
 STATE V. CLONTS

 Opinion of the Court

Carolina. Defendant left the military in early 2014, and moved into Allen’s house in

Mint Hill (“the house”). Denise Kathleen Whisman-Vazquez (“Whisman”)1 stopped

in Mint Hill on 28 July 2014 to visit Defendant, a friend from the Navy, while on her

way to Jacksonville.

 The following alleged facts are taken from: (1) a video interview Defendant

gave to police the night of 28 July 2014, which was played for the jury at the 16 June

2015 trial; (2) deposition testimony given by Whisman on 23 March 2015; and (3)

Allen’s testimony at trial. We present the relevant statements and testimony from

all three individuals because the similarities and differences between their

statements are particularly relevant to our review.

 Defendant and Whisman were having drinks at Whisman’s hotel when

Defendant texted Allen and asked Allen to join them. Whisman had never met Allen,

but she had heard a lot about him from Defendant, and testified: “In fact, I [honestly]

believed they were brothers.” Allen left work at approximately 6:30 p.m. and joined

Defendant and Whisman at the hotel. All three possessed valid concealed carry

permits and were armed. Allen visited with Defendant and Whisman before he left

to return home in his Jeep. Shortly thereafter, Defendant drove Whisman in her Jeep

 1 On 25 February 2014, Whisman still went by her maiden name “Vazquez,” but we will use
Whisman throughout this opinion because she is referred to as “Ms. Whisman” throughout the record
and transcripts.

 -2-
 STATE V. CLONTS

 Opinion of the Court

back to the house, and stopped on the way to purchase beer. At the house, Allen

joined Defendant and Whisman on the porch and all three drank some beers.

 All three continued to drink and things were, according to Allen, “happy go

lucky, joking around” until later in the night, when Whisman stated that she wanted

to go back to her hotel. Defendant stated that, because he was planning to drive

Whisman back to her hotel that night, he had stopped drinking at approximately 9:30

p.m., but that Whisman was intoxicated at the time she asked to leave the house.

 Allen testified concerning Whisman: “She was happy throughout the whole

night, obviously became more and more intoxicated throughout the night, and she

wanted to leave.” Allen testified that because of Whisman’s condition, he “asked her

to stay, stick around. I told her she could sleep [anywhere in the house], just stay

here. She agreed.” According to Allen, after the first time he asked Defendant and

Whisman not to leave, they all “continued to drink and laugh and joke and have fun.”

Allen testified that only later did Whisman again state her desire to leave, and that

“[Defendant] and [ ] Whisman decided they were going to go jump in [Whisman’s]

Jeep.” Allen believed at the time Whisman attempted to leave that she was impaired,

but that Defendant was not impaired. However, Allen did not want Defendant to

drive anywhere at that time because Defendant had been drinking. Neither

Whisman nor Defendant corroborated Allen’s testimony concerning this initial

encounter.

 -3-
 STATE V. CLONTS

 Opinion of the Court

 Whisman testified that, after a few hours of drinking at the house, she wanted

to return to her hotel room. When she told Defendant and Allen that she wanted to

leave, Defendant “was cool with it. And I guess [Allen] was okay with it until it was

a reality, and then he wasn’t okay with it anymore.” She testified that Allen did not

want either her or Defendant to drive because they had both been drinking, but that

Defendant had stopped drinking earlier “because he was going to drive back to the

hotel, and so he got into the driver’s side.”

 Defendant stated that once Whisman told him she wanted to leave, Defendant

told Allen goodbye and got into the driver’s seat of Whisman’s Jeep, while Whisman

got into the front passenger seat. After Defendant started the Jeep, Allen came

“storming out,” and the mood of the evening, which had up until then been jovial,

changed dramatically. Defendant said that Allen was screaming at them and “it was

bad.” Defendant had the Jeep in reverse, ready to leave, when Allen approached the

Jeep and told Defendant to “turn off the f*cking truck.” Defendant claimed Allen was

“irrational.” At this point, Defendant stated that Whisman “started to freak, quite

literally.”

 According to Whisman’s testimony, after she said she wanted to leave she got

into the passenger side of her Jeep, “[a]nd then [Allen] . . . walked over . . . and was

very angry and was trying to tell [Defendant] not to drive.” Whisman testified that

Allen yelled something like “where the f*ck do you think you’re going.” She said that

 -4-
 STATE V. CLONTS

 Opinion of the Court

Allen “seemed very agitated that we were leaving” and was yelling at Defendant;

Defendant than “got out of [Whisman’s] Jeep and tried to calm him down.”

 Allen testified that he may have told Whisman at some point in time that she

was “not going to leave[,]” but that Whisman and Defendant attempted to leave

anyway. Allen testified that he was by his porch when he heard the Jeep doors “open,”

so he “grabbed [his] gun, met them out there.” Allen testified that Defendant and

Whisman had their guns with them, too. He stated: “Why? I don’t know. We just

did.”2 Allen testified that it was not Defendant who was in the driver’s seat; that it

was Whisman who was going to drive Defendant back to the hotel.

 Allen testified that he went to the driver’s side of Whisman’s Jeep, reached into

the vehicle, and retrieved the keys. He was not certain “if [he] pulled ‘em out of the

ignition or if [Defendant] handed ‘em to me.” Allen testified that he might have asked

Whisman “What the f*ck are you doing?” Allen testified he threw Whisman’s keys

into the woods near his recycling container, whereupon Whisman “freaked out.”

 Defendant stated that, in response to Allen’s behavior, he took the key out of

the ignition, exited the Jeep, and tried to talk to Allen and calm him down. Defendant

stated that Whisman then got out of the passenger seat, recovered a spare key from

 2 Defendant and Whisman were planning to drive back to the hotel at that time, and would
naturally have their firearms with them. It is unclear why Allen thought he should take his gun to
confront Defendant and Whisman at her Jeep.

 -5-
 STATE V. CLONTS

 Opinion of the Court

a bag in her Jeep, climbed into the driver’s seat, and placed the spare key in the

ignition.

 Whisman testified that she made it clear to Allen that she wanted to leave, but

“the more I said it, the more irritated [Allen] got, so I decided to get into the driver

seat because I was bound and determined that I was going to leave.” Whisman

testified that, once she sat down, Allen “pulled me out of the driver seat of my Jeep,

lifted me out of the driver seat of my Jeep, threw me up against a tree and was

screaming at me” saying “how dare you try to leave.” Whisman stated that Allen’s

hands were “[a]round my shoulders and neck.” Whisman testified that she was

terrified because she had been in “a situation like that before.”

 According to Defendant, after he had exited Whisman’s Jeep and Whisman had

gotten into the driver’s seat, Allen “came up, shoved me out of the way, grabbed

[Whisman] by the hair, [and] pulled her out onto the ground.” Defendant stated that

at first, while on the ground, Whisman was laughing, perhaps thinking that Allen

was joking around. However, Whisman’s laughing “infuriated” Allen, and he grabbed

Whisman and “had her up against a tree, hand around her throat, faces nose to nose,

asking her if she thought it was a f*cking joke.” Defendant stated that at this point

Whisman was “hysterical. I’m trying to break them up, but – it might be cowardly –

but I knew that he would go off. And, with her in close proximity, that would not be

 -6-
 STATE V. CLONTS

 Opinion of the Court

a very good thing.” Defendant stated that Whisman “got free” and started “backing

away, down towards the pond.”

 According to Whisman, Defendant “got [Allen] away from me and was trying

to calm me down[,]” then she walked around the side of the house while Defendant

and Allen were still up at her Jeep. Whisman “just stood around on the side of the

house. I was very upset and [Defendant] was calming [Allen] down.” She testified

that at one point Allen was “crouching and calling me basically like I was his dog,

telling me that it was okay, come here, patting his leg.”

 Allen testified that he did not remove Whisman from her Jeep, that after he

threw her keys she got out herself “and she took off screaming.” According to Allen,

“Whisman jumped out of the Jeep, took off running down . . . on the left side of the

house. She screamed, ‘Sam [Defendant], don’t let him do this to me again.’” Allen

testified that Whisman ran in back around his house “into the dark[.]” Allen also

denied pushing Whisman up against a tree or screaming right in her face once she

was out of her Jeep. Allen testified that at that point he disarmed himself by placing

his weapon on his chicken coop because “‘[o]bviously, for some reason she was afraid

of me[,]’” then he moved toward Whisman and “tried to reason with her.” However,

Allen later testified that, after Whisman ran off, he remained standing by the chicken

coop for a minute then walked back to his porch. Allen told police investigators that

he disarmed himself because Whisman was “screaming she was afraid for her life.”

 -7-
 STATE V. CLONTS

 Opinion of the Court

The State introduced photographs of Allen’s handgun and magazine on top of his

chicken coop, which was positioned between his house and Whisman’s Jeep.

 Allen testified that Whisman screamed: “Sam [Defendant], don’t let him do this

to me again” either once or twice, but mainly she was screaming: “‘Help.” Allen

testified that he did not know what Whisman meant by: “Sam [Defendant], don’t let

him do this to me again.” Allen denied clapping his hands together and calling for

Whisman to come back like he was calling to a dog. Allen testified that Defendant

went into the woods to find Whisman, and she eventually stopped screaming.

 Defendant stated that he decided to go find Whisman, and he located her near

the back of the house. He stated that he was going to walk Whisman to Allen’s

parent’s house, which was nearby, “because I didn’t have a vehicle to drive her out of

there.” Defendant walked Whisman around the house and back to the driveway “to

get back to the road” to walk her to Allen’s parent’s house, but Allen came out and

said: “No, you’re not going anywhere. You need to go to sleep or we’re gonna have a

f*cking problem.”

 Allen testified that while Whisman was in his back yard, and

 after I announced that I had unloaded my gun and put it
 down, she still kept screaming. . . . I tried to reason with
 [her]. It had irritated me. [Defendant] had walked around
 the left side of the house to try to calm [her] down. I walked
 onto the deck. [ ] Whisman and [Defendant] walked
 around. I walked back out into the driveway. [Defendant]
 c[a]me up to the back end of my Jeep there.

 -8-
 STATE V. CLONTS

 Opinion of the Court

 Whisman testified that, after she walked beside the house, Defendant came

down to where she was standing “and tried to calm me down. He walked me back up

towards the front of the house [near] my Jeep. I got back into the passenger side of

the Jeep, and [Allen] started screaming at [Defendant] again, and they walked over

toward [Allen’s] Jeep.” Allen testified that he remembered Defendant meeting him

at the rear of his Jeep, and remembered telling Defendant to: “Fix your bitch[,]” and

“get her under control.”

 Defendant said Whisman was still hysterical, and Allen told her to “sit down”

but she refused. Defendant stated that Allen then said to him “you and I are going

to have some words,” and that Allen got “in my face, nose to nose, says why are you

choosing this bitch over me, etc, etc.” Defendant stated that he had his gun in his

right-side waistband, so he kept his hands “firmly in [his] pockets” and he “wasn’t

going to move them.” Defendant stated that he did this to be non-threatening, and

out of fear that Allen might either take Defendant’s gun away from him, or retrieve

his own gun from the chicken coop.

 Allen testified that he told Defendant: “You need to tell your bitch to shut up.”

He said he called Whisman a “bitch” twice. Allen testified that Defendant “chest-

bumped” him and said “‘[d]on’t call her a bitch[,]’” so Allen gave Defendant a “right-

hook . . . to the face[.]” Allen testified that he hit Defendant because Allen was just

“trying to help” and Defendant was being “disrespectful” by bumping him in the chest.

 -9-
 STATE V. CLONTS

 Opinion of the Court

Allen testified that he was shorter than Defendant, but a physically “bigger guy,” and

that he knocked Defendant to the ground with “one punch.” Allen testified that he

turned to walk back to the house but Defendant pushed him in the back, so he turned

and “I hit him again,” and Defendant “went down.”

 Defendant stated that once he and Allen were at the rear of Allen’s Jeep, Allen

“chest pushed” Defendant a few times, and asked him “you want to go [meaning fight

with Allen]?” Allen then hit Defendant with a closed fist two times to the left side of

Defendant’s face. Defendant said his hands remained inside his pockets and he did

not retaliate, hoping that Allen would calm down and go inside the house. Defendant

stated that Allen was “infuriated at this point[,]” and that Defendant had seen Allen

in bar fights and “they’re not pretty.” Defendant stated about Allen: “I can’t match

him physically, I just can’t.” Defendant said that he fell backwards, but not down, in

response to Allen’s punches.

 Whisman testified that Defendant’s hands were at his sides when he was

talking to Allen, and when Allen punched Defendant. Whisman did not believe

Defendant had done anything to provoke Allen, or “make any type of aggressive

gesture towards” him. Whisman saw Defendant fall against Allen’s Jeep, but did not

see Defendant fall to the ground. Whisman further stated that because she was

getting out of her Jeep to try and assist Defendant, she did not know if Allen hit

 - 10 -
 STATE V. CLONTS

 Opinion of the Court

Defendant a second time. As Whisman was heading over to the two men, Defendant

was not fighting back, and as she got near, Allen turned his attention to her.

 Allen testified that, after the second time he hit Defendant, which knocked

Defendant back to the ground, Whisman came up to him and said: “‘Don’t hit him.

Hit me.’” According to Allen, once Whisman approached him, “some words were

exchanged,” and “I got hit in . . . the right side of my head [by Whisman.]” Allen

testified that, in response: “I believe I had pushed [Whisman] twice.” He testified

that first he “gave [Whisman] a little shove to get a little bit of distance between us[,]”

but she “stepped back into it” so he stepped toward her and gave her another stronger

push with two hands. Allen testified that Defendant was behind him at this time,

that after his second push of Whisman, she ended up “in the middle of [a] green patch”

in his yard, but that she never fell to the ground.

 According to Allen, after the second time he pushed Whisman: “I heard bang

bang. All I remember is going down to my knees and then bang again, and that’s the

round that knocked me over.” Allen testified that Defendant screamed Allen’s name

just before the first shot was fired. Allen testified that the last time he saw Whisman

after having been shot, she was standing about fifteen to twenty feet away from him.

 According to Defendant, after Allen punched him twice, Whisman was to

Defendant’s left and Allen then “changed targets” and “went after [Whisman] and

had his hand around her throat again and leg-swept her onto the ground.” He said

 - 11 -
 STATE V. CLONTS

 Opinion of the Court

this all happened very fast, and he heard a “smack” and Allen had Whisman on the

ground. According to Defendant, Allen had “one hand full of [Whisman’s] hair,” and

had his other arm drawn back and ready to strike downwards with a balled fist.

 Defendant stated that “at this point [when Allen had Whisman on the ground]

I decided that he was going to kill either of us, or at least seriously injure, so I made

the split instant decision to defend myself and her.” Defendant said he drew his

weapon from his waistband, “lined up my sights, I screamed [Allen’s] name” at least

twice. “When I lined up my shot, because I did not want to hit her, I had his full

frontal chest.” Defendant stated that he wanted to make sure he did not hit

Whisman, but as he fired Allen had turned to “deliver a strike” to Whisman so Allen’s

“back ended up to me[.]” Defendant stated that he was standing three to seven feet

from Allen when he fired, and that his weapon jammed after the third shot.

 Whisman testified concerning those final moments:

 [Defendant and Allen] were standing by [Allen]’s Jeep and
 I was watching them, and [Allen] hit [Defendant]. And
 [Defendant] was leaned up against the side of [Allen’s]
 Jeep, and I got out of my Jeep to step between them. And
 while I was between them [Allen] was screaming at me,
 and he pushed me to the ground and I felt my ankle pop.
 And I buried my face in the ground and covered my head
 with my arms.

 ....

 [Defendant]’s back was to us when I stepped up between
 them because he was leaning against the Jeep, and [Allen]
 was facing [Defendant].

 - 12 -
 STATE V. CLONTS

 Opinion of the Court

 Q. And you said that [Allen] shoved you, is that correct, of
 what happened next?

 A. Yes.

 Q. And with one hand, with two hands? How did he shove
 you?

 A. I believe he grabbed my shoulder and threw me to the
 ground.

 Q. And you said that you then fell to the ground and put
 your hands over your head; is that correct?

 A. Yes.

 Q. And what happened next?

 A. I was really afraid that he was going to – he was going
 to kill me, so I stayed in that position. And then I heard
 three rapid fired shots and I stood up and I thought it was
 me that was shot. And I looked behind me and [Allen] was
 on the ground calling Doc, Doc,3 I’ve been hit; I can’t feel
 my legs.

 Whisman testified that, when Allen threw her to the ground, she landed so

hard that her “glasses came off[,]” then Allen “came towards” her. Whisman stated

that she covered her head because she “thought [Allen] was going to kick my face in.”

Whisman testified that she could not remember for certain if Allen was touching her

when she heard the shots, but she did not believe he was. Whisman stated that the

last thing she remembered seeing before the shots were fired was Allen “over the top

 3 Allen often referred to Defendant as “Doc.”

 - 13 -
 STATE V. CLONTS

 Opinion of the Court

of me.” Whisman testified that she did not believe Allen would have stopped

attacking her if Defendant had not intervened.

 Defendant stated that, after the shooting, the “air [was let] out of the balloon.

He was my friend again.” Defendant was not certain Allen was not a continuing

threat, so he grabbed Whisman’s arm and pulled her away to a safe distance, then

called 911. Defendant said that Allen was crying, asked him to call 911, and asked

Defendant to give him a hug. Defendant stated that he placed his weapon on the

ground and went to Allen, found his wounds, and started administering first aid,

which he continued doing until police arrived and took over.

 Allen testified that he could not remember asking Defendant to “[g]ive me a

hug” after he was shot, but that he did not doubt that he had said it. Whisman

testified that, after the shooting, Defendant called 911 and told her to “go inside and

get his med bag.” Defendant then administered aid to Allen until the police arrived.

 When Mint Hill Police Officer Joshua Kelly (“Officer Kelly”) arrived at the

scene of the shooting with two other officers, he first saw Defendant “administering

first aid” to Allen. Defendant alerted Officer Kelly to the presence of his handgun

seven to ten feet away by pointing and saying: “‘The weapon is over there.’”

Defendant also pointed out where another handgun was located, and informed the

officers that that weapon had not been fired. Officer Kelly testified that, after

 - 14 -
 STATE V. CLONTS

 Opinion of the Court

Defendant was arrested, he transported Defendant to jail, and that Defendant was

not showing obvious signs of impairment.

 Allen was taken to the hospital, where he remained for a “month and a half.”

The bullets remained in Allen’s body, and he remained wheelchair-bound at the time

of trial, unable to walk, with a diagnosis of permanent partial paralysis.

 Mint Hill Police Detective Keith A. Mickovic (“Detective Mickovic”)

interviewed Defendant at the police department just before midnight on 28 July 2014.

Defendant signed a waiver of his Miranda rights. Detective Mickovic testified, that

after his nearly two hour interview with Defendant, he did not believe Defendant to

be “in the least” intoxicated.

 B. Pre-Trial Motions, Deposition of Whisman

 Relevant to this appeal, Defendant notified the State that he would be

pursuing a claim of defense of others. The State filed a “Motion to Depose Witness

Prior to Trial” on 25 February 2015, claiming that Whisman was “an essential

witness,” that the “State intends to call the above-captioned matter for trial the week

of June 14, 2015,” and that Whisman would be “unavailable” to attend trial at that

time because she was currently under orders of deployment lasting from 19 February

2015 until 31 December 2015. Arguing that the trial court “has the inherent

authority ‘to do all things that are reasonably necessary for the proper administration

of justice’ and [ ] Whisman’s testimony is essential for the proper administration of

 - 15 -
 STATE V. CLONTS

 Opinion of the Court

justice in the above-captioned case[,]” the State requested that “the certified

transcript and/or video of the deposition . . . be admissible at trial in lieu of [ ]

Whisman’s live testimony, pursuant to NCGS § 804(b)(1), as well as NCGS § 8-85.”

In anticipation of Defendant’s request that the trial be continued until Whisman’s

deployment ended, the State argued that her “currently-scheduled and past

international deployments suggest that, even if the State were to wait until she

returns from her currently-scheduled deployment, she will always be in danger of

being deployed overseas yet again.”

 Defendant responded to the State’s 25 February 2015 motion on 27 February

2015, opposing the request to allow a pre-trial video deposition of Whisman’s

testimony, and opposing being deprived of the right to confront Whisman in person

at trial. Defendant argued that the 14 June 2015 date was the first time the matter

had been scheduled for trial, that Defendant “would consent to a continuance of the

trial until such time that Whisman is available[,]” and that Defendant “would further

waive any speedy trial rights if the matter were continued.” Defendant further

argued that since Whisman had already been deployed – beginning 19 February 2015

– having her return to North Carolina during deployment for a deposition would not

be any different than having her return for trial. Defendant argued that “the State

does not have the authority to conduct pretrial depositions of witnesses” without

 - 16 -
 STATE V. CLONTS

 Opinion of the Court

Defendant’s consent, citing our Supreme Court’s opinion in State v. Hartsfield.4

Defendant disputed the State’s assertion that the trial court’s “inherent authority ‘to

do all things that are reasonably necessary for the proper administration of justice’

would . . . extend to allow the prosecution to take a deposition of one of its witnesses

when resetting the trial date would resolve the issue.” Defendant finally argued that

to deprive him of his right to question Whisman in front of the jury, when she could

be made available, violated his Sixth Amendment rights as guaranteed by the

Confrontation Clause, as well as the corresponding rights guaranteed him by the

North Carolina Constitution.

 Judge W. Robert Bell heard the State’s motion on 4 March 2015, and entered

an order 9 March 2015. At the hearing, the State stated: “I don’t see how the state

can get this case done without having [Whisman] here.” The trial court ruled that

because Whisman would likely be deployed out of the country “[b]eginning in early

April 2015 . . . until December 2015[,]” and because she would, after that date, remain

 4 “There is no statute in North Carolina authorizing the taking of depositions to be used as
evidence by the State in criminal prosecutions. This privilege is extended to the defendant in certain
cases [N.C. Gen. Stat. § 8-74], but it may not be exercised by the State as a matter of right. With
respect to the witnesses offered by the prosecution, the defendant has the right to demand their
presence in the courtroom, to confront them with other witnesses, and to subject them to the test of a
competent cross-examination where their bearing and demeanor may be observed by the jury. The
defendant may not be required, against his will, to examine the State’s witnesses in the absence of the
jury. He ‘is entitled to have the testimony offered against him given under the sanction of an oath,
and to require the witnesses to speak of their own knowledge, and to be subjected to the test of a
competent cross-examination.’” State v. Hartsfield, 188 N.C. 357, 359, 124 S.E. 629, 630 (1924)
(citations omitted). We note that N.C. Gen. Stat. § 8-74 allows a defendant to depose a witness in
certain circumstances when that witness’s ability to attend trial is in question, but includes no
corresponding provision providing the same authority to the State in a criminal trial.

 - 17 -
 STATE V. CLONTS

 Opinion of the Court

“in danger of being deployed overseas again[,]” Whisman should be deposed the week

of March 23 in case “she is ‘unavailable’ according to NCGS § 8C-1, Rule 804(a)(5)

when the matter is called for trial.”

 Whisman was subpoenaed, returned to North Carolina from Camp Pendleton,

in California, and was deposed 23 March 2015 in the presence of Judge Carl Fox.

Defendant again objected to the taking of Whisman’s deposition. Following the

deposition, the following discussion occurred:

 [THE STATE]: Your Honor, at this time the State would
 ask this hearing be terminated and ask that [ ] Whisman
 be allowed to go back to serving our country.

 THE COURT: All right. Do you have any objection to
 releasing the witness?

 [DEFENDANT’S COUNSEL]: Well, we would in light of
 our objections to this proceeding. If she’s under a subpoena
 we would ask that she not be released from her subpoena.
 [Emphasis added].

 THE COURT: Well, you do agree that this terminates the
 deposition, though.

 [DEFENDANT’S COUNSEL]: This terminates this
 proceeding, yes, Your Honor.

 THE COURT: All right. Then the Court notes the
 defendant’s objection and the witness is released from her
 subpoena to go.

 [THE STATE]: Thank you, Your Honor.

 - 18 -
 STATE V. CLONTS

 Opinion of the Court

 The State filed “Notice of Intention to Admit Prior Testimony” on 22 May 2015,

“because the State anticipate[d] Whisman being ‘unavailable’ for trial[.]” Ten days

after filing this notice, 1 June 2015, the State apparently deposited a subpoena in the

mail, destination Darwin, Australia, demanding Whisman’s appearance at trial. This

matter came to trial on 15 June 2015, in front of Judge Jeffrey P. Hunt. The State

filed a “Motion in Limine” that same day moving the trial court “to allow the State to

introduce the transcript and/or video recording from former testimony of [Whisman],

an unavailable yet critical witness, during trial pursuant to N.C.G.S. § 8C-1, Rule

804(b)(1).”

 C. Trial

 The State’s motion in limine was heard the morning of 15 June 2015, the first

day of Defendant’s trial. The State did not argue any basis in support of its motion

beyond that contained in its written motion. Defendant again objected, reiterating

his belief that the State had no authority to depose its witness prior to trial without

Defendant’s consent, that “[a]s far as her unavailability, my understanding is that, if

the request was made to her command to have her come, they would make

arrangements[,]” that Defendant had objected to Whisman being released from

subpoena after her deposition, but “she was released and we’re here today[,]” and that

“[a]ll we had to do was continue the trial . . . and she would be here.” The trial court

granted the State’s motion based upon the following relevant findings:

 - 19 -
 STATE V. CLONTS

 Opinion of the Court

 I’m going to enter the following order. That the matter
 came up on motion of the State to use – I believe it’s 804.
 Is that the rule – to use 804, testimony in the form of a
 video of a – of an indispensable witness who’s in the
 military. The Court heard argument of both sides
 regarding the availability or unavailability of said witness.
 The Court finds the witness is in the military and is
 stationed outside of the State of North Carolina currently.
 May be in Australia or whereabouts may be unknown as
 far as where she’s stationed.

 Based on these findings, the trial court ruled that Whisman was unavailable,

and that Defendant’s confrontation rights would not be violated by allowing the video

of Whisman’s deposition to be entered into evidence in lieu of her live testimony before

the jury. Whisman did not appear at trial, and her video deposition testimony was

entered into evidence in lieu of her live testimony. The evidentiary portion of

Defendant’s trial concluded on 18 June 2015.

 Closing arguments were delivered on 19 June 2015. In its closing argument,

the State focused primarily on the following evidence. Allen was unarmed when

Defendant shot him three times in the back, that “the crux of this entire case [was]

did [Defendant] use excessive force” in response to Allen’s actions, thus negating any

claim of defense of other. The State argued: “Three shots to the back of an unarmed

man who [D]efendant knew to be unarmed, excessive force.” The State argued that,

even if the jury believed Defendant’s first shot was reasonable, the second and third

shot were clearly excessive. The State argued that Defendant gave conflicting

statements during his interview with Detective Mickovic concerning the moments

 - 20 -
 STATE V. CLONTS

 Opinion of the Court

right before he shot Allen. Specifically, the State argued that Defendant first said

Allen had a handful of Whisman’s hair, then that Allen was standing over Whisman

when he was shot, and finally, that in his written statement Defendant said Allen

had his hands around Whisman’s throat.

 The State conceded certain evidence from Whisman and Defendant, and

thereby acknowledged that Allen had not been completely truthful in his own

testimony. Specifically, the State argued:

 [W]e know when the ruckus started near [Whisman]’s
 Jeep, both [Whisman] and [D]efendant tell us that . . . Allen
 had [Whisman] up against the tree briefly. [D]efendant
 said that [Allen] had her by the throat. [Whisman] said it
 was sort of the shoulder/neck area. [ ] Allen did not say
 this happened, but, again, the two of them pretty quickly
 after this happened said that that’s what happened, so I
 think you could reasonably assume that there was
 something like that going on.

 The State informed the jury that it generally believed Whisman to be a credible

witness. The State then went on to explain why it believed Whisman was screaming:

“Sam [Defendant], don’t let him do this to me again.”

 Also on the stand, pretty significant, clearly she’d been
 through something like this. Remember, [ ] Allen testified
 he heard her saying, “Don’t let him do this to me again.”
 There’s no dispute [ ] Allen had never met [ ] Whisman
 before. They had never met once. They talked on the
 phone maybe a couple times, if even that. So she was
 clearly going somewhere in her own mind that was not
 having anything to do with [ ] Allen. We know that.
 (Emphasis added).

 - 21 -
 STATE V. CLONTS

 Opinion of the Court

The State argued that Whisman was not pleading with Defendant to prevent Allen

from assaulting her again, but was reliving some incident in her past that made her

unreasonably fearful that evening.

 The State told the jury to focus on Defendant’s intent, arguing: “You don’t get

to empty a weapon or attempt to empty a weapon in someone’s back and say you

weren’t trying to kill them.” The State focused on the elements of defense of another

– whether it was “reasonable” for Defendant “to perceive this kind of harm based on

the fact that [Allen] had touched [Whisman] three times[,]” and whether Defendant

actually felt that Whisman was in imminent danger of death or great bodily harm.

The State’s theory on Defendant’s motive to shoot Allen was revenge: “[W]as he really

thinking I just got punched twice in the face and now I’ve got my chance? Because

remember, right before he shot [ ] Allen he’d been punched twice in the face. Didn’t

hit back.” The State further argued that firing three shots at Allen constituted

excessive force and, therefore, prevented Defendant from being able to rely on defense

of another.

 In Defendant’s closing, he focused on the testimony of Whisman, Defendant,

Officer Kelly, and Detective Mickovic that Defendant was not intoxicated the night

of 28 July 2014. “[Defendant] and [Whisman] go to the Jeep and [Defendant] is going

to drive because he had stopped drinking and he says that and the officers said that

he was sober. He was using common sense. That makes sense, he’s the designated

 - 22 -
 STATE V. CLONTS

 Opinion of the Court

driver. His car is back at the hotel.” Defendant focused on the fact that Allen’s own

rules were that you did not mess with guns when you’d been drinking, but that when

Allen went out to confront Defendant and Whisman about leaving, he picked up his

handgun and brought it with him. Defendant contended that, after Allen pulled

Whisman out of her Jeep and onto the ground, she laughed, and this angered Allen,

who then “takes her and puts her up against that tree and she freaks out.” That once

Defendant came to assist her, Whisman ran “into the night, the woods, and she’s

screaming, ‘Don’t let him do this to me again.’” Defendant recalled Allen’s testimony

that he didn’t know what Whisman meant by “don’t let him do this to me again,” but

suggests: “let’s use our common sense. [Allen] pulls [Whisman] out of the car and

puts her up against a tree. Maybe don’t let [Allen] attack me again, does that make

sense?”

 Defendant argued that Defendant tried to remove Whisman from the scene,

and thus end the altercation, but when they came around the other side of the house,

Whisman “starts to scream again because [Allen] is waiting for them because he

wants to stop them[.]” Defendant further argued:

 Some things everyone agreed on, [Allen] hit [Defendant],
 either they had chest-bumped or [Defendant] was like this
 trying to reason with his brother. [Whisman] comes to help
 [Defendant] because she’s not going to sit there and watch
 her friend get hit. And [Allen] turns his attention to her,
 and he pushes her once according to her testimony, maybe
 twice according to [Allen], twice according to [Defendant],
 and she ends up on the ground. She is covering her head

 - 23 -
 STATE V. CLONTS

 Opinion of the Court

 because she’s afraid of what he is going to do. This man
 that she has never met has changed. Everything was fine
 until it’s time to go. He assaults her when he pulls her from
 the Jeep and assaults her when he puts her up against the
 tree, and now it’s even more vicious because he has
 punched and put [Defendant] on the ground and now it’s
 her turn. The violence is escalating. And before he can
 inflict gross bodily injury, before he can kick her face and
 before he can kill her [Defendant] shoots three times.

 Following the closing arguments, the trial court instructed the jury, inter alia,

on assault with a deadly weapon with intent to kill inflicting serious injury, and on

the lesser included offense of assault with a deadly weapon inflicting serious injury.

Concerning the “intent to kill” element of assault with a deadly weapon with intent

to kill inflicting serious injury,5 the trial court instructed the jury: “The State must

prove that [D]efendant had the specific intent to kill the victim.” “You arrive at the

intent of a person by such just and reasonable deductions from the circumstances

proven as a reasonably prudent person would ordinarily draw therefrom.” The trial

court also instructed the jury on defense of another:6

 [You must] also consider whether [D]efendant’s actions are
 excused and [D]efendant is not guilty because [D]efendant
 acted in defense of a third person. The State has the
 burden of proving from the evidence beyond a reasonable
 doubt that [D]efendant’s action was not in defense of a
 third person. If the circumstances would have created a
 reasonable belief in the mind of a person of ordinary
 firmness that the assault was necessary or reasonably

 5 Absent a jury determination that Defendant intended to kill Allen, the most that the jury
could have convicted Defendant of would have been assault with a deadly weapon inflicting serious
injury.
 6 Also known as “defense of a third person.”

 - 24 -
 STATE V. CLONTS

 Opinion of the Court

 appeared to be necessary to protect a third person from
 imminent death or great bodily harm and the
 circumstances did reasonably create such a belief in
 [D]efendant’s mind at the time [D]efendant acted, such
 assault would be justified – such assault would be justified
 by defense of a third person. You the jury determine the
 reasonableness of [D]efendant’s belief from the
 circumstances appearing to [D]efendant at the time.

 Now, a defendant does not have the right to use excessive
 force. [D]efendant had the right to use only such force as
 reasonably appeared necessary to [D]efendant under the
 circumstances to protect a third person from death or great
 bodily harm. In making this determination, you should
 consider the circumstances as you find them to have
 existed from the evidence, including the size, age and
 strength of [D]efendant and the third person as compared
 to the victim, the fierceness of the assault, if any, upon the
 third person, whether the victim had a weapon in the
 victim’s possession and the reputation, if any, of the victim
 for danger and violence. (Emphasis added).

 The jury found Defendant guilty of assault with a deadly weapon with intent

to kill inflicting serious injury on 19 June 2015. Defendant filed a motion for

appropriate relief (“MAR”) on 29 June 2015, then filed an amended MAR on 15

December 2015, arguing that “the trial court erred by permitting the State to

introduce a video deposition of a witness rather than calling that witness live at trial”

in violation of Defendant’s rights under the North Carolina and United States

Constitutions, that the trial court erred by failing to instruct the jury on the doctrine

of imperfect self-defense, and that there was insufficient evidence to have convicted

 - 25 -
 STATE V. CLONTS

 Opinion of the Court

Defendant. The trial court denied Defendant’s MAR by order entered 29 February

2016. Defendant appeals.

 II. Analysis

 A. Whisman’s “Unavailability”

 In Defendant’s first argument, he contends the trial court erred by finding

Whisman “unavailable” for the purposes of N.C. Gen. Stat. § 8C-1, Rule 804(a)(5), and

allowing her deposition testimony to be presented instead of requiring her live

testimony at trial. Defendant further argues that depriving him of his right to

confront Whisman in front of the jury violated the Confrontation Clause of the Sixth

Amendment of the United States Constitution, as well as his rights under Article I,

Sections 19 and 23, of the North Carolina Constitution. Defendant also contends that

the trial court erred in denying that portion of his amended MAR based upon the

above arguments. We agree.

 1. Standards of review

 Rule 804 of the North Carolina Rules of Evidence allows prior testimony of a

witness to be introduced at trial in lieu of the live testimony of that witness in certain

circumstances, including:

 The following are not excluded by the hearsay rule if the
 declarant is unavailable as a witness:

 (1) Former Testimony. – Testimony given as a witness
 at another hearing of the same or a different
 proceeding, or in a deposition taken in compliance with

 - 26 -
 STATE V. CLONTS

 Opinion of the Court

 law in the course of the same or another proceeding, if
 the party against whom the testimony is now offered
 . . . had an opportunity and similar motive to develop
 the testimony by direct, cross, or redirect examination.

N.C. Gen. Stat. § 8C-1, Rule 804(b) (2015). Our Supreme Court has discussed how

Rule 804 limits when a witness may be declared “unavailable,” and the State relied

upon the following condition – (5) – to argue Whisman was unavailable:

 Under the Rules of Evidence, a witness is considered
 “unavailable” when that witness:

 ....

 (5) Is absent from the hearing and the proponent of [her]
 statement has been unable to procure [her] attendance
 . . . by process or other reasonable means.

 N.C.G.S. § 8C–1, Rule 804(a). Before a trial court may
 admit hearsay testimony under Rule 804(b), it must find
 that at least one of the conditions listed in Rule 804(a) has
 been satisfied.

State v. Nobles, 357 N.C. 433, 439–40, 584 S.E.2d 765, 771 (2003) (citation omitted)

(emphasis added). In the present case, although the State argued that Whisman was

unavailable pursuant to Rule 804(a)(5), the trial court made no such finding in its

order, merely stating: “That the matter came up on motion of the State to use – I

believe it’s 804. Is that the rule – to use 804, testimony in the form of a video of a –

of an indispensable witness who’s in the military.”

 In order for a trial court to find a witness “unavailable” for the purposes of the

Confrontation Clause:

 - 27 -
 STATE V. CLONTS

 Opinion of the Court

 “the possibility of a refusal [by the witness] is not the
 equivalent of asking and receiving a rebuff.” In short, a
 witness is not “unavailable” for purposes of the foregoing
 exception to the confrontation requirement unless the
 prosecutorial authorities have made a good-faith effort to
 obtain [her] presence at trial.

Barber v. Page, 390 U.S. 719, 724–25, 20 L. Ed. 2d 255, 260 (1968) (citation omitted).

 The State contends that “it is unclear what standard of review applies to a trial

court’s ruling that a witness is unavailable.” The State cites two cases from our

Supreme Court to highlight this uncertainty: State v. Fowler, 353 N.C. 599, 548

S.E.2d 684 (2001), and State v. Bowie, 340 N.C. 199, 456 S.E.2d 771 (1995). To the

extent, if any, that these two opinions are in conflict, Fowler, as the most recent

pronouncement from our Supreme Court, controls. In Fowler, the defendant was

contesting the admission of a witness’ out-of-court statements based upon N.C. Gen.

Stat. § Rule 804, Article I, Section 23 of the North Carolina Constitution, and the

Confrontation Clause. Fowler, 353 N.C. at 607, 548 S.E.2d at 692.

 The Court in Fowler consistently analyzed whether the trial court’s findings of

fact related to the witness’ unavailability were supported by the evidence and, in

turn, supported its conclusions of law. Fowler, 353 N.C. at 610, 548 S.E.2d at 693

(“The trial court’s detailed findings of fact are sufficient to support its conclusion that

[the witness] was unavailable.”); Id. at 614, 548 S.E.2d at 695–96 (“Contrary to

defendant’s contention, the trial court’s findings support a conclusion that the state

acted diligently in trying to produce [the witness] to testify. . . . . The trial court

 - 28 -
 STATE V. CLONTS

 Opinion of the Court

made the following findings of fact to support its conclusion: (1) state officials

contacted [the witness] in India, and [the witness] informed them there was no way

he would return to the United States to testify; (2) [the witness] was not willing to

return to this country because his painful injuries made travel difficult and he feared

for his safety; (3) the state spoke numerous times with [the witness]’s brother in

California in attempts to locate [the witness]; (4) the state offered to provide [the

witness] with police protection during his stay; and (5) the state offered to pay for

[the witness]’s airfare, lodging, meals, and care for his injuries during his stay. These

facts are sufficient to support the trial court’s conclusion that the state’s efforts to

produce [the witness] were diligent.”).

 The requirement that the trial court enter sufficient findings of fact to support

its conclusion of unavailability is further established by State v. Triplett:

 The degree of detail required in the finding of
 unavailability will depend on the circumstances of the
 particular case. For example, in the present case, the
 declarant is dead. The trial judge’s determination of
 unavailability in such cases must be supported by a finding
 that the declarant is dead, which finding in turn must be
 supported by evidence of death. Situations involving out-
 of-state or ill declarants or declarants invoking their fifth
 amendment right against self-incrimination may require a
 greater degree of detail in the findings of fact.

State v. Triplett, 316 N.C. 1, 8, 340 S.E.2d 736, 740–41 (1986) (citation omitted)

(emphasis added). “Before a trial court may admit hearsay testimony under Rule

804(b), it must find that at least one of the conditions listed in Rule 804(a) has been

 - 29 -
 STATE V. CLONTS

 Opinion of the Court

satisfied. The proponent of the statement bears the burden of satisfying the

requirements of unavailability under Rule 804(a).” Nobles, 357 N.C. at 440, 584

S.E.2d at 771 (citations omitted). The trial court was required to make sufficient

findings of fact, based upon competent evidence, in support of any ruling that the

State had satisfied its burden of demonstrating that it had “been unable to procure

[Whisman’s] attendance . . . by process or other reasonable means” for the purposes

of N.C. Gen. Stat. § 8C–1, Rule 804(a)(5), and that it had “made a good-faith effort to

obtain [her] presence at trial” for Confrontation Clause purposes. Barber, 390 U.S.

at 725, 20 L. Ed. 2d at 260.

 2. Inadequate Findings of Fact

 In the present case, the entirety of the trial court’s findings of fact related to

the State’s burden to prove Whisman’s unavailability at trial were as follows:7 “The

[trial court] finds [Whisman] is in the military and is stationed outside of the State

of North Carolina currently. May be in Australia or whereabouts may be unknown

as far as where she’s stationed.” The trial court’s findings were sufficient to

demonstrate that Whisman was “absent from the hearing[.]” N.C. Gen. Stat. § 8C–

1, Rule 804(a)(5). However, the trial court made no findings that would support more

than mere inference that the State “ha[d] been unable to procure [her] attendance

 7Although the prior orders of the other judges were presumably before the trial court on 15
June 2015, none of the findings of the prior orders were adopted by the trial court in its 15 June 2015
ruling.

 - 30 -
 STATE V. CLONTS

 Opinion of the Court

. . . by process or other reasonable means.” Id. The trial court made no findings

concerning any efforts made by the State to procure Whisman’s presence at trial, nor

any findings demonstrating the necessity of proceeding to trial without Whisman’s

live testimony. See Fowler, 353 N.C. at 614, 548 S.E.2d at 695–96. The trial court

did not address the option of continuing trial until Whisman returned from her

deployment, nor did it make any finding that the State “made a good-faith effort to

obtain [Whisman’s] presence at trial[,]” much less any findings demonstrating what

actions taken by the State could constitute good-faith efforts. Barber, 390 U.S. at

724-25, 20 L. Ed. 2d at 260.

 Although the State places much focus on findings made by different judges at

earlier hearings, it was the duty of the judge who heard the State’s 15 June 2015

motion in limine to make all relevant and necessary findings and conclusions in

support of its ruling that Whisman was “unavailable” for the purposes of Rule 804

and the Confrontation Clause, and that admission of her deposition testimony

without her being present was therefore proper. The trial court’s 15 June 2015 ruling

failed to include the necessary findings of fact, and we therefore hold that it was error

to grant the State’s motion to admit Whisman’s deposition testimony in lieu of her

live testimony at trial. For this same reason, it was error for the trial court to deny

Claim 1 of Defendant’s amended MAR – that the trial court erred “by permitting the

State to introduce a video deposition of a witness rather than calling that witness[.]”

 - 31 -
 STATE V. CLONTS

 Opinion of the Court

 3. Inadequate Evidence of “Unavailability”

 Even assuming, arguendo, the trial court’s findings of fact and conclusions had

been sufficient to support its ruling, we further hold that the evidence presented to

the trial court was insufficient to support an ultimate finding of “unavailability.”

 a. Subpoena

 The State filed a motion in limine on 15 June 2015, requesting the trial court

allow the video of Whisman’s deposition be entered into evidence and presented at

trial in lieu of in-person testimony by Whisman, and the motion was heard on that

date. In this motion, the State argued the following evidence relevant to Whisman’s

alleged “unavailability:”

 8) [ ] Whisman is currently enlisted in the United States
 Navy as a Corpsman.

 9) Pursuant to [ ] Whisman’s obligations in service to our
 nation, she is currently assigned to provide naval support
 to a United States Marine Corps mission. See Exhibit A
 for a copy of [ ] Whisman’s military orders.

 10) Since April 2015, [ ] Whisman has been deployed out of
 the country, and she is not scheduled to return until
 December 2015.

 11) Due to the potential threat to national security
 associated with revealing such information, the United
 States Navy, in communications with the undersigned
 Assistant District Attorney (see Exhibit B) has indicated
 that it will not disclose [ ] Whisman’s whereabouts.

 12) The undersigned Assistant District Attorney was
 provided with a mailing address to send a subpoena to [ ]

 - 32 -
 STATE V. CLONTS

 Opinion of the Court

 Whisman, which was sent via registered mail (see Exhibit
 C).

Exhibit C includes a copy of an undelivered subpoena signed on 28 May 2015 by an

Assistant District Attorney. The addresses included on the subpoena are what

appear to be Whisman’s California street address, and an address for a Marine base

in Australia: “Marine Rotational Forces [sic] Darwin, 1st BN, 4th Marines, Unit 10126,

FPO AE8 96610-0126.” The presence of this address on the subpoena suggests that,

contrary to the State’s assertions in its motions and at trial, the Navy had not

“indicated that it would not disclose [ ] Whisman’s whereabouts,” at least relative to

the location of her overseas command.

 Further, in both the 18 February 2015 and the 20 May 2015 letters from the

Marine Corps indicating that Whisman would be deployed overseas and that the

Marines might not be forthcoming with Whisman’s particular location at any specific

time, the State was provided with a singular phone number for two personnel who

were each identified as “[t]he point of contact for this matter[.]”9 There is no record

evidence that the State contacted either of these people.

 The sole attempt to obtain Whisman’s attendance at trial appearing in the

record was the “Exhibit C” subpoena apparently sent to Darwin, Australia shortly

before trial. Further included in Exhibit C is a receipt for “certified mail” postmarked

 8 AE stands for “Armed Forces Europe” which is the incorrect designation for Marine
Rotational Force Darwin, which should have been AP – “Armed Forces Pacific.”
 9 A different person was given as the “point of contact” in each of the two letters.

 - 33 -
 STATE V. CLONTS

 Opinion of the Court

1 June 2015, and an undated webpage printout from USPS.com indicating that the

certified mail postmarked 1 June 2015 arrived at a Postal Service facility in Chicago

in the afternoon of 5 June 2015, and that “[t]he item is currently in transit to the

destination.”10

 The included certified mail receipt indicates that $2.80 was paid for “Return

Receipt (hardcopy),” though the appropriate box was not checked. Further, the space

on the receipt for the “Sent To” address was left blank. In a box marked “Official Use”

was included “FPO AP 96610[.]” This “Official Use” entry is the only indication that

the certified mail receipt is connected with the subpoena. From the record it appears

that only one subpoena was sent. The “Official Use” entry of “FPO AP 96610” would

seem to indicate that the single piece of certified mail was sent to Marine Rotational

Force Darwin. Though “Return Receipt (hardcopy)” was apparently paid for, no

return receipt is included in the record, suggesting the certified mail was never

delivered. There is no indication of when the USPS.com tracking webpage printout

was obtained. If the State obtained this tracking information right before the 15 June

2015 hearing, then the subpoena had not even reached Australia by that time. What

is certain is that the subpoena – assuming that was what was included in the certified

mail – was still in the United States on 5 June 2015 for a trial that was scheduled to

begin the week of 14 June 2015, and which in fact commenced 15 June 2015. The

 10 We assume these items are included as part of Exhibit C, though they are not clearly marked
as such.

 - 34 -
 STATE V. CLONTS

 Opinion of the Court

State produced no evidence that its subpoena reached its destination, much less that

it reached its destination in time to have been meaningful.11

 b. Code of Federal Regulations

 We take judicial notice that rules concerning requests for the return of naval

service members to the United States, and the service of process on members of the

Navy are set forth in the Code of Federal Regulations (“the Code”), specifically 32

CFR “Part 720—Delivery of Personnel; Service of Process and Subpoenas; Production

of Official Records.” Subpart D of Part 720 states in relevant part: “This instruction:

Establishes policy and procedures for requesting the return to the United States of,

or other action affecting, Department of the Navy (DON) personnel . . . serving outside

the United States . . . in compliance with court orders.” 32 C.F.R. § 720.40(b).

Request for return is defined as: “Any request or order received from a court, or from

federal, state or local authorities concerning a court order, for the return to the United

States of members . . . for any reason listed in § 720.42.” 32 C.F.R. § 720.41. There

is nothing in Subpart D indicating that a subpoena is required for initiating a request

for return.

 32 C.F.R. § 720.42 states that “[i]t is Department of the Navy policy to

cooperate, as prescribed in this instruction, with courts and federal, state and local

 11 The State acknowledges that “[t]here is no indication in the record that the subpoena was
served on [ ] Whisman.”

 - 35 -
 STATE V. CLONTS

 Opinion of the Court

officials in enforcing court orders. 32 C.F.R. § 720.42(a).12 The Code further identifies

the “responsible officials” authorized to respond to requests for the return of

members. 32 C.F.R. § 720.42(g), 32 C.F.R. § 720.44. Contact information is given for

these responsible officials in 32 C.F.R. § 720.43(a), and this section also provides a

place to send requests when the appropriate responsible official is uncertain. 32

C.F.R. § 720.43(b). There is no record evidence that the State attempted to obtain

the presence of Whisman at trial through the procedures laid out in Subpart D of 32

C.F.R. § 720, though Subpart D would appear to offer “other reasonable means” of

attempting to procure Whisman for trial as authorized in Rule 804(a)(5).

 The Code also specifically addresses the method for subpoenaing members to

appear as witnesses in State courts:

 Where members . . . are subpoenaed to appear as witnesses
 in State courts, and are served as described in §[ ] 720.20,
 720.20(d) applies. . . . . If State authorities are attempting
 to obtain the presence of a member . . . as a witness in a
 civil or criminal case, and such person is unavailable
 because of an overseas assignment, the command should
 immediately contact the Judge Advocate General[.]

 12 32 C.F.R. § 720.42 is the section establishing appropriate “reasons” for requests for return.
32 C.F.R. § 720.41 (“Request for return. Any request or order received from a court, or from federal,
state or local authorities concerning a court order, for the return to the United States of members . . . for
any reason listed in § 720.42.”). Though Subpart D seems to be primarily related to the return of
“members” to face criminal charges, there is nothing in Subpart D making this specific limitation. See
32 C.F.R. § 720.41 (“Respondent. A member, employee, or family member whose return to the United
States has been requested, or with respect to whom other assistance has been requested under this
instruction.”).

 - 36 -
 STATE V. CLONTS

 Opinion of the Court

32 C.F.R. § 720.21 (emphasis added). The Code does contemplate service on out-of-

state members by mail:

 Out-of-State process. In those cases where the process is
 to be served by authority of a jurisdiction other than that
 where the command is located, the person named is not
 required to accept process. . . . . If service of process is
 attempted from out-of-State by mail and refused, the refusal
 should be noted and the documents returned to the sender.
 Questions should be referred to the staff judge advocate,
 command counsel, or the local naval legal service office.

32 C.F.R. § 720.20(a)(2) (emphasis added). In general, the following rules apply for

serving subpoenas: “Commanding officers afloat and ashore may permit service of

process of . . . State courts upon members . . . residing at or located on a naval

installation, if located within their commands.” 32 C.F.R. § 720.20(a). There is no

record evidence that the subpoena mailed to Australia on 1 June 2015 was addressed

to the attention of the appropriate commanding officer, the Judge Advocate General,

or any other individual that was authorized by the Code to facilitate service of the

subpoena or grant any request that Whisman be returned to North Carolina to testify.

 When service of process is effectuated, the commanding officer will normally

try and facilitate compliance:

 When members . . . are either served with process, or
 voluntarily accept service of process . . . the commanding
 officer normally will grant leave or liberty to the person
 served to permit compliance with the process, unless to do
 so would have an adverse impact on naval operations. . . . .
 When it would be in the best interests of the United States

 - 37 -
 STATE V. CLONTS

 Opinion of the Court

 Government (for example, in State criminal trials), travel
 funds may be used to provide members . . . as witnesses[.]

32 C.F.R. § 720.20(d) (emphasis added). If service is not permitted, or if the served

member is not allowed leave in response to the subpoena, “a report of such refusal

and the reasons therefor shall be made . . . to the Judge Advocate General[.]” 32

C.F.R. § 720.20(e).

 It is unclear what method was used by the State to subpoena Whisman while

she was still in California, but it is clear that the appropriate authorities cooperated

in order that Whisman could attend the 23 March 2015 deposition. However, there

is no record evidence that the State attempted any timely subpoena of Whisman for

the 15 June 2015 trial date, nor that it complied with the Code in its attempted

method of service. Had the State’s subpoena by certified mail reached the proper

authorities, they would have been required under the Code to respond; either by

facilitating Whisman’s return to North Carolina to testify at trial, or by refusing

service and returning the subpoena to the State with notification that service was

rejected. 32 C.F.R. § 720.20(a)(2). Relying on the record evidence, neither of these

outcomes occurred, which suggests that the State’s improper method of service either

prevented the subpoena from reaching a proper authority, or delayed service until

there was no possibility for Whisman to make the trip from Australia to North

Carolina by 15 June 2015.

 - 38 -
 STATE V. CLONTS

 Opinion of the Court

 In its 15 June 2015 motion, the State provided the following additional

rationale for why the trial court should find that Whisman was “unavailable” for the

purposes of Rule 804(b)(1) and the Confrontation Clause:

 In the present case, the State received information from
 the United States Navy that [ ] Whisman would be
 deployed out of the country at the time of trial. Further, [
 ] Whisman’s prior history of foreign deployment (e.g.,
 Guantanamo Bay, Cuba) suggested that even if the State
 were to wait for her to return to the country before calling
 the matter for trial, she could be deployed again. With
 these things in mind, the State flew [ ] Whisman to
 Charlotte from California to be deposed, all at the State’s
 expense, the week before she was scheduled to be shipped
 out of the country. Since the deposition, the State has been
 in contact with officials from the United States Navy, who
 have confirmed that [ ] Whisman is deployed and that her
 whereabouts constitute a matter of national security.13

 ....

 Given that the Defendant was present at the deposition
 and represented by counsel with the opportunity to cross-
 examine [ ] Whisman, the Defendant’s Constitutional
 rights were protected. Cf., e.g., State v. Ross, 216 N.C. App.
 337 (2011) (no violation of Confrontation Clause at trial
 when court admitted testimony from probable cause
 hearing, because such hearing provided adequate prior
 opportunity to cross-examine).

At the 15 June 2015 motion hearing, the State made the following oral argument:

 Since [Whisman’s deposition] the State has received
 further confirmation as indicated in that motion that she
 is not available. The military has indicated as a matter of

 13 There is no record evidence supporting this contact between the State and the Navy beyond
the generic 20 May 2015 letter from the Commanding Officer of the 1 st Medical Battalion of the Marine
Corps.

 - 39 -
 STATE V. CLONTS

 Opinion of the Court

 national security they will not disclose where she is. I don’t
 know how to get her here. We have made very good effort,
 Your Honor, flying her out here to testify in the first place.
 I couldn’t tell you where she is now. I’ve provided
 documentation from the United States Navy indicating as
 such. So would ask that you declare her unavailable and
 admit her prior testimony under the former testimony
 exception to the hearsay rule.

 Based upon the above, the State’s relevant evidence in support of Whisman’s

alleged unavailability was as follows: that she would be serving overseas as a Navy

corpsman until December 2015; that her whereabouts were currently unknown, but

that the State had been provided “with a mailing address to send a subpoena to [her;]”

that the State had sent a subpoena, presumably to the mailing address provided,

approximately two weeks before the time Whisman was required for trial; and that

there had been no response from Whisman. Record evidence strongly suggests that

the subpoena never reached Whisman. Although the State mainly focused its

argument on evidence related to the effort it took to subpoena and procure Whisman

for the 23 March 2015 deposition, none of that evidence is relevant to our

“unavailability” analysis, which is entirely limited to whether she could be produced

at trial.

 Defendant responded to the State’s argument as follows:

 Your Honor, at this time we would renew our objections,
 first to even the taking of the deposition. We contend that
 it was an abuse of Judge Bell’s power in violation of the
 defendant’s rights under the United States and North
 Carolina Constitution, Fifth, Sixth and Fourteenth

 - 40 -
 STATE V. CLONTS

 Opinion of the Court

 Amendments, to even take. All we had to do was continue
 the trial until October14 and she would be here.

 As far as her unavailability, my understanding is that, if
 the request was made to her command to have her come,
 they would make arrangements. She is in Australia
 according to her Facebook page, you know, so, again, we
 understand that she’s not here. At the end of the
 videotaped deposition the State asked for her to be released,
 we objected to that, she was released and we’re here today.

The Code supports Defendant’s assertion that the policy of the Navy and Marine

Corps is to help facilitate the availability of its members to testify in criminal

proceedings when possible. 32 C.F.R. § 720.20.

 Further, the trial court’s refusal to continue the trial to a date subsequent to

Whisman’s return from Australia, and the State’s request that the trial court deny

Defendant’s motion to continue, is an important factor to be considered in our

“unavailability” analysis. Our analysis is not confined to whether Whisman was

unavailable for trial on the specific date of 15 June 2015, but whether Whisman was

unavailable to testify at Defendant’s trial, whenever that trial might have taken

place, considering all relevant factors, rights, and policy considerations.

 However, the trial court ruled that Whisman was “unavailable” for Rule 804

and Confrontation Clause purposes, and allowed Whisman’s deposition testimony in

lieu of her live testimony at trial, based entirely upon the following findings of fact:

 14 We presume Defendant meant until after December 2015.

 - 41 -
 STATE V. CLONTS

 Opinion of the Court

“The Court finds the witness is in the military and is stationed outside of the State of

North Carolina currently. May be in Australia or whereabouts may be unknown as

far as where she’s stationed.”

 c. Rule 804

 We hold that even had the trial court made findings and conclusions

supporting that the State “has been unable to procure [her] attendance . . . by process

or other reasonable means[,]” as required by N.C. Gen. Stat. § 8C-1, Rule 804(a)(5),

the record evidence would not support this conclusion. The State could have

requested that its original subpoena of Whisman remain in place until trial, or it

could have served her with a new subpoena when she was in North Carolina for the

23 March 2015 deposition, but it did not do so. See N.C. Gen. Stat. § 8-63 (2015)

(“Every witness, being summoned to appear in any of the said courts . . . shall appear

accordingly, and . . . continue to attend from session to session until discharged,

. . . when summoned in a criminal prosecution, until discharged by the court, the

prosecuting officer, or the party at whose instance he was summoned[.]”); N.C. Gen.

Stat. § 8-59 (2015) (“In obtaining the testimony of witnesses in causes pending in the

trial divisions of the General Court of Justice, subpoenas shall be issued and served

in the manner provided in Rule 45 of the Rules of Civil Procedure for civil actions.

Provided that in criminal cases any employee of a local law-enforcement agency may

 - 42 -
 STATE V. CLONTS

 Opinion of the Court

effect service of a subpoena for the attendance of witnesses by telephone

communication with the person named.”).

 Instead, the State made a direct request that the trial court release Whisman

from its subpoena, and instead apparently mailed a subpoena, addressed to no one,15

to Marine Rotational Force Darwin, in Australia, two weeks before the start of trial.

This subpoena was still in the United States ten days before trial, and there is no

record evidence that it ever reached its destination. Further, the State could have

either suggested a continuation of the trial until after Whisman’s deployment ended,

or at least not objected to Defendant’s repeated requests to continue the trial so

Whisman could testify in person. The State articulated no compelling reason in

support of its objection to a continuance, nor did the trial court justify the necessity

for denying a continuance. We are unable to find any compelling reason why the trial

could not have been continued until after Whisman’s return from deployment.

 We do not find the efforts of the State to effectuate Whisman’s appearance at

trial to have been reasonable or made in good faith, as there is almost no possibility

that the subpoena could have reached Whisman in time for her command to have

granted her leave to respond; the State had ample opportunity to maintain or

effectuate service in March 2015; and there were other methods available to the State

to try and obtain Whisman’s presence at trial that it did not pursue. See Nobles, 357

 15 The “New Navy Standardized FPO Mail Address Format” requires the intended recipient’s
name, listed first. See http://www.navy.mil/submit/display.asp?story_id=84519.

 - 43 -
 STATE V. CLONTS

 Opinion of the Court

N.C. at 437–38, 584 S.E.2d at 770. The evidence presented by the State was

insufficient to sustain an ultimate finding that it had “been unable to procure

[Whisman’s] attendance . . . by process or other reasonable means[,]” N.C. Gen. Stat.

§ 8C-1, Rule 804(a)(5) and, in fact, no such finding was made. For this alternate

reason, we also hold that the trial court erred in admitting Whisman’s deposition

testimony in lieu of her live testimony at trial.

 d. Confrontation Clause

 Defendant also argues that allowing Whisman’s deposition testimony in lieu of

her live testimony at trial violated the Confrontation Clause of the Sixth Amendment

of the United States Constitution. We agree.

 The United States Supreme Court has stated: “We observed in Coy v. Iowa that

‘the Confrontation Clause guarantees the defendant a face-to-face meeting with

witnesses appearing before the trier of fact.’” Maryland v. Craig, 497 U.S. 836, 844,

111 L. Ed. 2d 666, 677 (1990) (citations omitted) (emphasis added). The United States

Supreme Court long ago clarified the primary objective of the Confrontation Clause:

 [T]he particular vice that gave impetus to the confrontation
 claim was the practice of trying defendants on ‘evidence’
 which consisted solely of ex parte affidavits or depositions
 secured by the examining magistrates, thus denying the
 defendant the opportunity to challenge his accuser in a face-
 to-face encounter in front of the trier of fact. . . . .

 [O]bjections occasioned by this practice appear primarily to
 have been aimed at the failure to call the witness to
 confront personally the defendant at his trial. So far as

 - 44 -
 STATE V. CLONTS

 Opinion of the Court

 appears, in claiming confrontation rights no objection was
 made against receiving a witness’ out-of-court depositions
 or statements, so long as the witness was present at trial
 to repeat his story and to explain or repudiate any
 conflicting prior stories before the trier of fact.

 Our own decisions seem to have recognized at an early date
 that it is this literal right to ‘confront’ the witness at the
 time of trial that forms the core of the values furthered by
 the Confrontation Clause[.]

California v. Green, 399 U.S. 149, 156–57, 26 L. Ed. 2d 489, 496 (1970) (citations and

footnotes omitted) (emphasis added). “Where testimonial statements are involved,

we do not think the Framers meant to leave the Sixth Amendment’s protection to the

vagaries of the rules of evidence, much less to amorphous notions of ‘reliability.’”

Crawford v. Washington, 541 U.S. 36, 61, 158 L. Ed. 2d 177, 199 (2004); see also

Fowler, 353 N.C. at 615, 548 S.E.2d at 696 (“This prong of the Roberts inquiry is called

the ‘Rule of Necessity.’ In analyzing this prong, a witness is not ‘unavailable’ for

purposes of the . . . confrontation requirement unless the prosecutorial authorities

have made a good-faith effort to obtain his presence at trial.”) (citation omitted).

 The United States Supreme Court has stated concerning the admission of

testimonial evidence by some means other than the testimony of the declarant at

trial:

 First, in conformance with the Framers’ preference for
 face-to-face accusation, the Sixth Amendment establishes
 a rule of necessity. In the usual case (including cases where
 prior cross-examination has occurred), the prosecution
 must either produce, or demonstrate the unavailability of,

 - 45 -
 STATE V. CLONTS

 Opinion of the Court

 the declarant whose statement it wishes to use against the
 defendant.

 The second aspect operates once a witness is shown to be
 unavailable.

Ohio v. Roberts, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 607 (1980), abrogated on other

grounds by Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177 (2004) (emphasis

added) (citations omitted). This Court has defined three separate steps required to

admit testimonial evidence in the absence of the declarant witness:

 Our Court has held that evaluating whether a defendant’s
 right to confrontation has been violated is a three-step
 process. We must determine: “(1) whether the evidence
 admitted was testimonial in nature; (2) whether the trial
 court properly ruled the declarant was unavailable; and (3)
 whether defendant had an opportunity to cross-examine
 the declarant.”

State v. Allen, 171 N.C. App. 71, 74–75, 614 S.E.2d 361, 364–65 (2005) (citations

omitted).

 These three steps are separate and sequential, they are not three factors in a

balancing test. Therefore, the trial court must first make a determination of whether

the relevant evidence is testimonial in nature; if the trial court determines that the

evidence is testimonial, then it must determine whether the declarant witness is

unavailable for trial; only upon finding in the affirmative for the first two inquiries

must the trial court make a determination concerning the defendant’s prior

opportunity to cross-examine the declarant witness. Id.; see also State v. McLaughlin,

 - 46 -
 STATE V. CLONTS

 Opinion of the Court

__ N.C. App. __, __, 786 S.E.2d 269, 277, appeal dismissed, disc. review denied, __

N.C. __, 787 S.E.2d 29 (2016). Therefore, in this matter, our unavailability analysis

does not consider the fact that Defendant’s attorney had the opportunity to fully

cross-examine Whisman in Defendant’s presence, before a trial judge applying the

rules of evidence, or that the examination was recorded on video and by a court

reporter. See Barber, 390 U.S. at 725–26, 20 L. Ed. 2d at 260.

 In the present case, Whisman’s deposition testimony clearly qualifies as

“testimonial” for Confrontation Clause purposes. Our analysis therefore next focuses

solely on whether the State carried its burden of demonstrating the unavailability of

Whisman for trial to a degree that survives constitutional scrutiny, and whether the

trial court’s ruling comports with the constitutions of North Carolina and the United

States, and other relevant law.

 The entirety of the trial court’s findings of fact related to the State’s burden to

prove Whisman’s unavailability at trial is as follows: “The Court finds [Whisman] is

in the military and is stationed outside of the State of North Carolina currently. May

be in Australia or whereabouts may be unknown as far as where she’s stationed.”

The trial court made no findings demonstrating the necessity of proceeding to trial

without Whisman’s live testimony. The trial court did not address the option of

continuing trial until Whisman returned from her deployment, nor did it determine

that the State “made a good-faith effort to obtain [Whisman’s] presence at trial”

 - 47 -
 STATE V. CLONTS

 Opinion of the Court

through its last minute attempt to subpoena her. Barber, 390 U.S. at 725, 20 L. Ed.

2d at 260. Further, “‘the possibility of a refusal is not the equivalent of asking and

receiving a rebuff.’” Id. at 724, 20 L. Ed. 2d at 260. Therefore the State’s argument

that, even after [Whisman] returned from her Darwin deployment, “she could be

deployed again[,]” does not carry weight. It is always possible that a service member

could be deployed out of the country. This ambiguous but persistent possibility

cannot serve to render every service member “unavailable” for an upcoming trial and

thereby justify infringement of a defendant’s constitutional right to confront that

service member, should the State wish to present testimonial evidence from that

service member at trial.

 We note that, when considering a defendant’s claim that his Sixth Amendment

right to a speedy trial has been violated, the United States Supreme Court, as well as

the appellate courts of North Carolina, have repeatedly held that granting a

continuance based upon the temporary unavailability of a witness, especially an

essential witness, is often appropriate, and is a factor that may justify delay of a trial

even when the defendant is requesting a “speedy trial” as guaranteed under the Sixth

Amendment. See Barker v. Wingo, 407 U.S. 514, 531, 33 L. Ed. 2d 101, 117 (1972) (“a

valid reason, such as a missing witness, should serve to justify appropriate delay [in

bringing a defendant to trial]”); State v. Jones, 310 N.C. 716, 719–20, 314 S.E.2d 529,

532 (1984). We see no legitimate reason why a trial court should not continue a trial

 - 48 -
 STATE V. CLONTS

 Opinion of the Court

to protect a defendant’s confrontation rights with the same flexibility that it offers the

State when it agrees to continue a trial in order for the State to present testimony of

an important witness at that trial. We find no compelling interest justifying the

denial of Defendant’s request to continue the trial to allow for Whisman’s live

testimony. The mere convenience of the State offers no such compelling interest:

 [R]espondent asks us to relax the requirements of the
 Confrontation Clause to accommodate the “‘necessities of
 trial and the adversary process.’” It is not clear whence we
 would derive the authority to do so. The Confrontation
 Clause may make the prosecution of criminals more
 burdensome, but that is equally true of the right to trial by
 jury and the privilege against self-incrimination. The
 Confrontation Clause—like those other constitutional
 provisions—is binding, and we may not disregard it at our
 convenience.

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 325, 174 L. Ed. 2d 314, 330 (2009).

 Upon review of Confrontation Clause jurisprudence, we note that a finding of

unavailability is generally proper when there is no possibility the witness can be

produced at trial, such as in cases when the witness has died or is terminally ill.16 A

finding of unavailability may be proper when the State demonstrates that the witness

is highly unlikely to be available for trial at any known date, such as when the witness

has fled the country in an intentional effort to avoid testifying, or the State

demonstrates that, after making sufficient reasonable efforts, it has been unable to

 16See N.C. Gen. Stat. 8C-1, 804(4) (2015); State v. Hurst, 127 N.C. App. 54, 59, 487 S.E.2d 846,
851 (1997).

 - 49 -
 STATE V. CLONTS

 Opinion of the Court

locate the witness.17 The common thread justifying entry of prior recorded testimony

is that the witness is either demonstrably unavailable for trial, or there is no evidence

to support a finding that, with a good-faith effort by the State, the witness may be

made available at some reasonable time in the future.

 By contrast, when a witness is unavailable for a limited period of time, courts

have been reluctant to find that witness unavailable for Confrontation Clause

purposes. See Peterson v. United States, 344 F.2d 419, 425 (5th Cir. 1965) (Witness

not found “unavailable” for Confrontation Clause purposes because she “was not

dead, beyond the reach of process nor permanently incapacitated. She was simply

unavailable at the time of trial because of her pregnancy. Considering the seriousness

of the charges and if the Government desired to use [her] testimony, it should have

requested a continuance to a time when she could probably be present.”) (emphasis

added); Smith v. United States, 106 F.2d 726, 728 (4th Cir. 1939) (Prior testimony of

an unavailable witness “is admitted only because the witness cannot be produced;

and it should not be admitted where the presence of the witness at the trial of the cause

might be had by the exercise of due diligence. . . . . That while it appeared from the

testimony of Dr. Handy that [the witness] was, at the time of this trial, in such

condition as not to be available as a witness, it likewise appeared that Dr. Handy

considered this condition as temporary.” Therefore, the witness should have “been

 17 See State v. Fowler, 353 N.C. 599, 610, 548 S.E.2d 684, 693 (2001); State v. Bowie, 340 N.C.
199, 456 S.E.2d 771 (1995).

 - 50 -
 STATE V. CLONTS

 Opinion of the Court

subpoenaed as a witness” or motion “made for a continuance of the case because of

her illness and until she could testify.”) (Emphasis added).

 We note that these medical “unavailability” cases are specifically contemplated

in Rule 804: “Evidence Rule 804(a)(4) states that a witness is unavailable if she is

unable to testify due to ‘an existing physical or mental illness or infirmity.’”18 State

v. Carter, 338 N.C. 569, 591, 451 S.E.2d 157, 169 (1994) (citation omitted). There is

no such statutory exception for an inability to testify due to military deployment.

 Further, the expected duration of the witness’ unavailability must be

considered, and according to some authority, the expected duration must be such that

there is no guarantee the witness will ever be available for trial:

 In criminal prosecutions, according to the weight of
 authority, the mere temporary illness or disability of a
 witness is not sufficient to justify the reception of his
 former testimony. . . .

 ....

 . . . it must appear that the witness is in such a state, either
 mentally or physically, that in reasonable probability he
 will never be able to attend the trial.

United States v. Amaya, 533 F.2d 188, 191 (5th Cir. 1976) (citations omitted). The

Amaya Court recognized that some jurisdictions’ requirements are not as rigid:

 Although the duration of an illness is a proper element of
 unavailability, the establishment of permanence as to the
 particular illness is not an absolute requirement. The

 18 Statutory provisions cannot, of course, alter constitutional requirements, but we find the
distinctions informative in our Sixth Amendment analysis.

 - 51 -
 STATE V. CLONTS

 Opinion of the Court

 duration of the illness need only be in probability long
 enough so that, with proper regard to the importance of the
 testimony, the trial cannot be postponed.

Id. (citation omitted).

 Although we have been unable to find binding precedent directly related to the

issue of military deployment and unavailability for Confrontation Clause purposes,

the United States Court of Military Appeals has rejected a finding of unavailability

of a witness due to deployment based upon the following reasoning:

 When offering the deposition on November 29, trial counsel
 represented to the military judge that the witness was on
 board ship and that the ship was still in training. . . . .
 Because the information provided to the military judge was
 not current, the actual unavailability of the witness at the
 time the deposition was offered into evidence was not
 established. Cf. Burns v. Clusen, 798 F.2d 931, 943 (7th
 Cir.1986) (Government’s burden to establish
 “unavailability is a continuing one”).

 Moreover, it is clear that the refresher training had been
 scheduled for months and was known well in advance by
 trial counsel. In spite of this, there appears to have been
 no accommodation made in setting the date of trial so the
 witness could testify before the factfinder. Certainly, the
 record provides no explanation why trial could not have
 commenced earlier or concluded later so the temporary
 unavailability of the witness would not have necessitated
 resort to “a weaker substitute for live testimony.” United
 States v. Inadi, 106 S. Ct. at 1126.

 - 52 -
 STATE V. CLONTS

 Opinion of the Court

United States v. Vanderwier, 25 M.J. 263, 266–67 (C.M.A. 1987) (citation omitted)

(emphasis added).19

 We hold that, just as in cases of unavailability due to mental or physical illness,

in order for the State to show that a witness is unavailable for trial due to deployment,

the deployment must, at a minimum, be “in probability long enough so that, with

proper regard to the importance of the testimony, the trial cannot be postponed.”

Amaya, 533 F.2d 188, 191.20 In the present case, the State described Whisman as

“an essential witness,” and we concur. Though Defendant had been afforded the

ability to cross-examine Whisman before trial, that fact has no bearing on Whisman’s

“unavailability” at trial for Confrontation Clause purposes. See Barber, 390 U.S. at

725–26, 20 L. Ed. 2d at 260 (“while there may be some justification for holding that

the opportunity for cross-examination of a witness at a preliminary hearing satisfies

the demand of the confrontation clause where the witness is shown to be actually

unavailable, this is not, as we have pointed out, such a case”) (emphasis added).

 19 We recognize the stark differences between Article III courts and military tribunals, but
agree with the proposition that the record must demonstrate some legitimate justification for the
refusal to grant a continuance when a defendant’s constitutional rights of confrontation are at issue.
See O’Callahan v. Parker, 395 U.S. 258, 23 L. Ed. 2d 291 (1969), overruled on other grounds by Solorio
v. United States, 483 U.S. 435, 97 L. Ed. 2d 364 (1987).

 20 “We need not prescribe in this case the exact dimensions of the rule, for under either
statement, the Government should have been required to elect either to proceed without [its witness]’s
testimony or to request a continuance.” Peterson, 344 F.2d at 425.

 - 53 -
 STATE V. CLONTS

 Opinion of the Court

 There were many steps the State could have taken to demonstrate a good-faith

attempt to procure Whisman for trial, including, primarily, requesting continuance

of the trial until she was available. We hold, on the facts before us, that the failure

to continue the trial until after Whisman’s deployment ended in December 2015,

alone, constituted a violation of Defendant’s confrontation rights.

 Additional steps that the State could have taken to demonstrate a “good faith

effort” to procure Whisman’s presence at trial include either requesting that she

remain under subpoena until trial instead of requesting that she be released from her

subpoena, or serving her with a new subpoena while she was in North Carolina for

her 23 March 2015 deposition. Finally, if the State wanted to make a serious attempt

to serve Whisman with a subpoena by mail while she was deployed in Australia, it

should have attempted service at a much earlier date, and complied with the Code

rules concerning service. “In this case the state authorities made no effort to avail

themselves of . . . alternative means of seeking to secure [Whisman’s] presence at

. . . trial.” Barber, 390 U.S. at 724, 20 L. Ed. 2d at 259-60.

 We hold that the State did not present the trial court with evidence sufficient

to demonstrate it had made a good-faith effort to obtain Whisman’s presence at trial:

 [A] witness is not ‘unavailable’ for purposes of . . . the
 confrontation requirement unless the prosecutorial
 authorities have made a good-faith effort to obtain his
 presence at trial. The State made no such effort here, and,
 so far as this record reveals, the sole reason why [the
 State’s witness] was not present to testify in person was

 - 54 -
 STATE V. CLONTS

 Opinion of the Court

 because the State did not attempt to seek [her] presence.
 The right of confrontation may not be dispensed with so
 lightly.

Id. at 724–25, 20 L. Ed. 2d at 260.

 We further hold, for the same reasons enumerated above, that allowing

Whisman’s deposition testimony in lieu of her live testimony at trial violated the

relevant protections of Article I of the North Carolina Constitution:

 “‘The central concern of the Confrontation Clause is to
 ensure the reliability of the evidence against a criminal
 defendant by subjecting it to rigorous testing in the context
 of an adversary proceeding before the trier of fact.’” We
 have generally construed the right to confrontation under
 our state constitution consistent with its federal
 counterpart.

Nobles, 357 N.C. at 435, 584 S.E.2d at 768 (emphasis added) (citations omitted). For

these additional reasons, we hold that the trial court erred in allowing Whisman’s

deposition testimony to be entered into evidence in lieu of her live testimony at trial,

and that the trial court further erred in denying Claim 1 in Defendant’s amended

MAR.

 4. Prejudice

 Because we have found that denying Defendant the opportunity to confront

Whisman at trial and in front of the jury violated the Confrontation Clause,

“[D]efendant is presumed to have been prejudiced[, and] the burden is upon the State

to show beyond a reasonable doubt that the error was harmless. N.C. Gen. Stat. §

 - 55 -
 STATE V. CLONTS

 Opinion of the Court

15A–1443(b) (2005).” State v. Bowman, 188 N.C. App. 635, 650, 656 S.E.2d 638, 650

(2008) (citation omitted). The United States Supreme Court has held regarding the

deprivation of a defendant’s right to cross-examine a State’s witness in front of the

jury:

 The correct inquiry is whether, assuming that the
 damaging potential of the cross-examination were fully
 realized, a reviewing court might nonetheless say that the
 error was harmless beyond a reasonable doubt. Whether
 such an error is harmless in a particular case depends upon
 a host of factors, all readily accessible to reviewing courts.
 These factors include the importance of the witness’
 testimony in the prosecution’s case, whether the testimony
 was cumulative, the presence or absence of evidence
 corroborating or contradicting the testimony of the witness
 on material points, the extent of cross-examination
 otherwise permitted, and, of course, the overall strength of
 the prosecution’s case.

Delaware v. Van Arsdall, 475 U.S. 673, 684, 89 L. Ed. 2d 674, 686 (1986) (citations

omitted) (emphasis added).

 a. Defense of Others

 Defendant did not deny shooting Allen on the night of 28 July 2014; his defense

at trial was that he was justified in shooting Allen because he believed it was

necessary to protect Whisman from death or great bodily harm.21

 In general one may kill in defense of another if one believes
 it to be necessary to prevent death or great bodily harm to
 the other and has a reasonable ground for such belief, the
 reasonableness of this belief or apprehension to be judged

 21 We limit our review to Defendant’s argument that the jury could have found that he was
justified in shooting Allen in defense of Whisman, and do not directly address his self-defense claim.

 - 56 -
 STATE V. CLONTS

 Opinion of the Court

 by the jury in light of the facts and circumstances as they
 appeared to the defender at the time of the killing.

State v. Perry, 338 N.C. 457, 466, 450 S.E.2d 471, 476 (1994) (citations and quotation

marks omitted).

 The State argues that “there was overwhelming evidence of [D]efendant’s guilt

even without [ ] Whisman’s testimony.” However, it is the State’s burden to prove

beyond a reasonable doubt that the error of denying Defendant the right to confront

Whisman live, in front of the jury, was harmless. Bowman, 188 N.C. App. at 650, 656

S.E.2d at 650. The error was not in admitting Whisman’s testimony, it was in the

manner in which it was admitted. Therefore, in order to prove beyond a reasonable

doubt that the error was harmless, the State must show that there was no “reasonable

possibility that the [error] complained of might have contributed to the conviction.”

State v. Heard, 285 N.C. 167, 172, 203 S.E.2d 826, 829 (1974).

 Defendant’s argument is not that Whisman’s testimony should have been

excluded, it is that because he was deprived of his right to cross-examine Whisman

at trial, in front of the jury, his case was prejudicially weakened. Resolution of this

case almost entirely relied upon the testimonies and statements of all three witnesses

that were present at the shooting, and Whisman was the witness most likely to have

had sway with the jury; the State referred to Whisman as the “one objective witness

who was there[.]”

 - 57 -
 STATE V. CLONTS

 Opinion of the Court

 The jury could have believed Allen, Defendant, or Whisman exclusively, or it

could have believed any combination of their statements. A thorough and complete

examination of Whisman’s and Allen’s testimony at trial was therefore of paramount

importance in swaying the jury to either Defendant’s or the State’s evidence of events.

If the jury believed Allen completely, then it would have likely believed he posed no

immediate threat to Whisman or Defendant at the time Defendant shot him.

 However, if there was a reasonable possibility the jury could have been swayed

to accept Defendant’s statements to police in their entirety, and believed Allen’s

testimony in a light favorable to Defendant, it would have found the following: Allen

was a man prone to bouts of violent rage, and Defendant had witnessed Allen severely

beat people in the past. Even though Allen himself did not believe Defendant was

drunk, Allen went into a rage when he saw that Defendant was attempting to drive

Whisman back to her hotel, so he grabbed his handgun, ran to Whisman’s door

screaming obscenities, and managed to get the keys to Whisman’s Jeep from

Defendant and throw them into the woods. After Whisman retrieved her spare keys

and got into the driver’s seat of her Jeep, Allen shoved Defendant out of the way,

“grabbed [Whisman] by the hair, [and] pulled her out onto the ground.” While on the

ground, Whisman laughed, which “infuriated” Allen, causing him to grab Whisman

off the grown, thrust her against a tree, and put his hands around her throat, get

directly in her face, and ask her “if she thought it was a f*ucking joke.”

 - 58 -
 STATE V. CLONTS

 Opinion of the Court

 Whisman was terrified and hysterical, and Defendant stepped between her

and Allen because Defendant “knew that [Allen] would go off. And with [Whisman]

in close proximity, that could not be a very good thing.” Whisman was “screaming

she was afraid for her life,” screamed “help” many times, and screamed “ Sam

[Defendant], don’t let him do this to me again.” “Obviously . . . [Whisman] was afraid

of [Allen.]”

 Allen later confronted Whisman and Defendant and told them they could not

leave, and that Defendant needed to “[f]ix your bitch[,]” and “get her under control.”

As Allen confronted Defendant, Defendant kept his hands firmly in his pants pockets

because his handgun was in his waistband and he did not want appear to be a threat,

or have Allen take Defendant’s gun, or have Allen retrieve his own gun. Defendant

was not provoking Allen, but Allen “chest pushed” Defendant a few times. Allen then

used his right fist to hit Defendant twice in the face, and Allen was “infuriated at

[that] point[.]” Defendant knew Allen could easily best him in a fistfight.

 After punching Defendant twice, Allen “changed targets” and “went after

[Whisman] and had his hand around her throat again and leg-swept her onto the

ground.” Allen held Whisman’s hair with one hand, and drew his other fist back like

he was going to punch Whisman in the face. Defendant screamed Allen’s name to get

him to stop his assault on Whisman, but Allen did not stop. At this point, Defendant

“decided that [Allen] was going to kill either of us, or at least seriously injure, so I

 - 59 -
 STATE V. CLONTS

 Opinion of the Court

made a split instant decision to defend myself and her.” Believing Whisman was in

imminent danger of being brutally assaulted by a man who was too strong and

proficient in fighting for Defendant to physically control, Defendant shot Allen to

prevent him from seriously injuring, or even killing, Whisman. Based upon Allen’s

actions that evening, Whisman, too, believed that Allen was going to kill her.

 The State itself, during its closing argument, admitted that important aspects

of Defendant’s story were correct, and thus Allen had credibility issues:

 [B]oth [Whisman] and [D]efendant tell us that . . . Allen
 had [Whisman] up against the tree briefly. [D]efendant
 said that he had her by the throat. She said it was sort of
 the shoulder/neck area. [ ] Allen did not say this happened,
 but, again, the two of them pretty quickly after this
 happened said that that’s what happened, so I think you
 could reasonably assume that there was something like
 that going on.

 Because Whisman’s testimony was presented by video deposition, Defendant

had no opportunity to cross-examine her in response to testimony and evidence that

came to light at trial. The State must show beyond a reasonable doubt that

Defendant’s lost opportunities to fully cross-examine Whisman in front of the jury

would not have affected either the jury’s credibility determinations or its decisions on

issues of fact in a manner that “might have contributed to the conviction.” Heard,

285 N.C. at 172, 203 S.E.2d at 829.

 The opportunity for cross-examination, protected by the
 Confrontation Clause, is critical for ensuring the integrity
 of the fact-finding process. Cross-examination is “the

 - 60 -
 STATE V. CLONTS

 Opinion of the Court

 principal means by which the believability of a witness and
 the truth of his testimony are tested.” Indeed, the Court
 has recognized that cross-examination is the “‘greatest
 legal engine ever invented for the discovery of truth.’” The
 usefulness of cross-examination was emphasized by this
 Court in an early case explicating the Confrontation
 Clause:

 “The primary object of the constitutional provision in
 question was to prevent depositions or ex parte
 affidavits . . . being used against the prisoner in lieu of
 a personal examination and cross-examination of the
 witness in which the accused has an opportunity . . . of
 testing the recollection and sifting the conscience of the
 witness[.]

Kentucky v. Stincer, 482 U.S. 730, 736, 96 L. Ed. 2d 631, 641-42 (1987) (citations

omitted). The United States Supreme Court, discussing Davis v. Alaska, 415 U.S.

308, 39 L. Ed. 2d 347 (1974), has considered the prejudice implications of a defendant

being denied the right to fully cross-examine a state’s witness in violation of the

Confrontation Clause:

 Defense counsel was barred from eliciting on cross-
 examination that [the witness] was on juvenile probation
 for burglary both at the time of his pretrial identification
 of [the defendant] and at the time of trial. The defense
 sought to suggest that [the witness] may have slanted his
 account in the State’s favor either to shift suspicion away
 from himself or to avoid revocation of probation for failing
 to “cooperate.” This Court reversed [the defendant]’s
 conviction, emphasizing that [the witness]’s testimony was
 “crucial” and that there was a “real possibility” that pursuit
 of the excluded line of impeachment evidence would have
 done “[s]erious damage to the strength of the State’s case.”

 - 61 -
 STATE V. CLONTS

 Opinion of the Court

Van Arsdall, 475 U.S. at 683, 89 L. Ed. 2d at 686 (citations omitted). As the United

States Supreme Court has reasoned when a defendant was not permitted to fully

cross-examine an essential witness concerning issues of credibility:

 We cannot speculate as to whether the jury, as sole judge
 of the credibility of a witness, would have accepted this line
 of reasoning had counsel been permitted to fully present it.
 But we do conclude that the jurors were entitled to have
 the benefit of the defense theory before them so that they
 could make an informed judgment as to the weight to place
 on [the State’s witness’] testimony which provided ‘a
 crucial link in the proof . . . of petitioner’s act.’ The
 accuracy and truthfulness of [the State’s witness’]
 testimony were key elements in the State’s case against
 petitioner.

Davis v. Alaska, 415 U.S. 308, 317, 39 L. Ed. 2d 347, 354 (1974).

 Had Whisman been present to testify at trial, she could have stated directly to

the jury that Allen was lying when he testified that he never assaulted Whisman by

holding her up against a tree by her neck, and when Allen testified that he did not

throw her to the ground right before the shooting. Being confronted with Allen’s

actual testimony, Whisman could have provided additional relevant testimony that

was not brought forth in her deposition, which was conducted without Defendant

having the benefit of the State’s actual evidence at trial, including Allen’s actual

testimony. Had Whisman been given the opportunity to respond directly to Allen’s

testimony, she could have both created more doubt in the minds of the jurors

 - 62 -
 STATE V. CLONTS

 Opinion of the Court

concerning Allen’s credibility, and could have provided additional testimony

surrounding the contested issues.

 For example, Whisman could have: responded to Allen’s comment that early

on in the confrontation “[o]bviously, for some reason she was afraid of me[,]” and that

later Whisman was “screaming she was afraid for her life[,]” by explaining why Allen

made her feel that way; responded to Allen’s testimony that he did not clap his hands

and call Whisman like he was calling a “dog;” clarified why she was yelling “help,” if

in fact she was doing so; or contested Allen’s testimony that Whisman pushed Allen

and hit him on the top of his head, and then came after Allen again after he pushed

her away. In light of Defendant’s and Allen’s conflicting statements concerning

Allen’s actions right before Defendant shot him, Whisman, had she been able to

testify at trial, could have more fully addressed those critical last moments,

potentially providing more credibility and support for Defendant’s version of those

most relevant events.

 Finally, Whisman was unable to respond to Allen’s testimony that she

screamed: “Sam [Defendant], don’t let him do this to me again.” The State, because

Whisman did not testify at trial, was able to argue to the jury that Whisman was not

asking Defendant to protect her from Allen, but was having a “flash-back” to some

earlier unrelated assault. Not only did the State’s depiction of Whisman’s statement

serve to potentially diminish the jury’s understanding of Whisman’s fear of Allen, it

 - 63 -
 STATE V. CLONTS

 Opinion of the Court

also served to potentially plant in the minds of the jurors that Whisman was over-

reacting to Allen’s actions in response to some prior trauma. The jury could have

believed Whisman was, perhaps even sub-consciously, irrationally inflating her fear

of Allen’s intent in the crucial moments just before Allen was shot. The jury could

have diminished or discounted Whisman’s testimony that Allen threw her to the

ground so hard her glasses came off, then he came after her, was “over the top of

[her]” as she lay on the ground, and that she did not believe Allen “was going to stop”

his assault. It was potentially critically important whether the jury believed

Whisman’s stated beliefs that “[Allen] was going to kick my face in[,]” and that she

“was really afraid [Allen] was going to – he was going to kill me[,]” were reasonable.

We therefore hold that the State failed to prove beyond a reasonable doubt that denial

of Defendant’s constitutional right to confront Whisman at trial and in front of the

jury had no prejudicial effect on the jury’s rejection of his “defense of another” defense.

 b. Intent to Kill

 Assuming arguendo the jury rejected both of Defendant’s defenses – self-

defense and defense of another – the jury still could have found that Defendant,

though acting unlawfully, did not intend to kill Allen, his “brother,” but merely sought

to prevent Allen from further assaulting Whisman. State v. Daniel, 333 N.C. 756,

763, 429 S.E.2d 724, 729 (1993) (“A specific intent to kill is an essential element of

assault with a deadly weapon with intent to kill inflicting serious injury. N.C.G.S. §

 - 64 -
 STATE V. CLONTS

 Opinion of the Court

14-32(a) (1986).”) (citation omitted). Determination of the lack, or presence, of a

defendant’s specific intent to kill is an “ultimate issue[ ] to be determined by the jury.”

Daniel, 333 N.C. at 763, 429 S.E.2d at 729 (citations omitted). Absent the jury finding

that Defendant intended to kill Allen, it could have at most convicted him of the lesser

included offense of assault with a deadly weapon inflicting serious injury.

 The State’s theory that Defendant formed the intent to kill Allen because he

was humiliated by having been punched by Allen required a fair amount of

speculation based upon circumstantial evidence. The State further argued that the

fact that Defendant shot Allen three times instead of firing once, or firing a warning

shot, was proof of Defendant’s intent to kill. Though we agree the jury could

reasonably view the facts in that manner, we hold that the State has failed to

demonstrate there was no “reasonable possibility that [denial of Whisman’s live

testimony in front of the jury] might have contributed to the conviction.” Heard, 285

N.C. at 172, 203 S.E.2d at 829.

 There was testimonial evidence that Defendant was never the aggressor

during the altercations leading up to the shooting; that Defendant attempted on

multiple occasions to calm both Allen and Whisman, and thereby de-escalate the

volatile situation; that Defendant did not react violently when Allen pushed him, or

immediately after Allen punched him twice in the face; and that Defendant called out

to Allen several times before pulling the trigger, which the jury could have

 - 65 -
 STATE V. CLONTS

 Opinion of the Court

interpreted as an attempt to get Allen to stop assaulting Whisman before resorting

to potentially deadly force. Further, Defendant called 911 and administered first aid

to Allen until the police arrived. The jury could have determined that, though

Defendant was not legally justified in shooting Allen three times, he never formed a

specific intent to kill his best friend.

 The jurors’ decisions on these issues were undoubtedly influenced by the

weight they gave to both Defendant’s statement and Whisman’s testimony. We hold

that there was a reasonable possibility that had Defendant been allowed to further

explore Whisman’s testimony concerning Allen’s assaultive actions, her fear that

Allen was going to “kick her face in” or “kill her,” and her plea: “Sam [Defendant],

don’t let him do this to me again[,]” the jury could have decided this additional

“testimony was ‘crucial’ and that there was a ‘real possibility’ that pursuit of the

excluded line of impeachment evidence [against Allen] would have done ‘[s]erious

damage to the strength of the State’s case’” that Defendant intended to kill Allen.

Van Arsdall, 475 U.S. at 683, 89 L. Ed. 2d at 686 (citations omitted); see also Id. at

683–84, 89 L. Ed. 2d at 686 (Remand was required because though “it is impossible

to know how [the] wrongfully excluded evidence would have affected the jury . . . [the

defendant] was denied an opportunity to cast doubt on the testimony of an adverse

witness. [T]he prosecution was thus able to introduce evidence that was not subject

to constitutionally adequate cross-examination. [T]he reviewing court should be able

 - 66 -
 STATE V. CLONTS

 Opinion of the Court

to decide whether the not-fully-impeached evidence might have affected the

reliability of the fact-finding process at trial.”).

 c. Prejudice Conclusion

 Whisman’s testimony was of overwhelming importance to Defendant’s defense;

her testimony was not cumulative, because it served as the most objective of three

sometimes competing recitations of the relevant events. Her testimony was generally

corroborated by both Allen and Defendant, but contradicted Allen’s testimony in ways

that, if further explored, could have had an impact on the jury’s credibility

assessments, and thus its verdict. The State’s case relied primarily on the testimony

of the witnesses concerning Allen’s actions and the threat he posed that night, as the

fact that Defendant shot Allen three times was not in dispute. We hold that “the not-

fully-impeached evidence might have affected the reliability of the fact-finding

process at trial[,]” Van Arsdall, 475 U.S. at 684, 89 L. Ed. 2d at 686 and, therefore,

the State has failed in its burden of proving the deprivation of Defendant’s

constitutional rights was “harmless beyond a reasonable doubt.” Id. at 684, 89 L. Ed.

2d at 687. We make this holding both with respect to the possibility that the jury

might have accepted Defendant’s “defense of another” claim, and with respect to the

possibility that the jury might have determined that Defendant did not act with the

intent to kill Allen and, therefore, could, at most, have been convicted of the lesser

included offense of assault with a deadly weapon inflicting serious injury.

 - 67 -
 STATE V. CLONTS

 Opinion of the Court

 B. Jury Instruction

 In Defendant’s second argument, he contends that “the trial court erred by

failing to instruct the jury on imperfect self-defense and imperfect defense of

others[.]” We disagree.

 Defendant did not request the trial court give any instruction on imperfect self-

defense or imperfect defense of others. In fact, when the State indicated that it

believed imperfect self-defense or imperfect defense of others was not legally

available to Defendant in this situation, Defendant’s counsel agreed with the State.

Defendant cannot show prejudice from invited error. See State v. Hope, 223 N.C. App.

468, 472, 737 S.E.2d 108, 111 (2012).

 By informing the trial court that he agreed instructions on imperfect self-

defense or imperfect defense of others were not legally available to him, Defendant

invited any alleged error, and waived right to appellate review. Id. Defendant is, of

course, free to request those instructions should this matter again proceed to trial.

We therefore further hold that the trial court did not err in denying the related claim,

Claim II, in Defendant’s amended 15 December 2015 MAR.

 III. Conclusion

 We point out in response to the dissenting opinion that a new trial is granted

for multiple and independent reasons, including: (1) The trial court failed to make

required findings of fact concerning Whisman’s unavailability. See Nobles, 357 N.C.

 - 68 -
 STATE V. CLONTS

 Opinion of the Court

at 440, 584 S.E.2d at 771; Triplett, 316 N.C. at 8, 340 S.E.2d at 740–41. (2) The

evidence presented at the hearing on the State’s motion in limine was insufficient to

meet the State’s burden of demonstrating Whisman’s unavailability for purposes of

both Rule 804(a)(5) and the Confrontation Clause. We specifically hold that the

State’s attempt to subpoena Whisman for trial did not constitute “a good-faith effort

to obtain [her] presence at trial” as required by Barber. Barber, 390 U.S. at 725, 20

L. Ed. 2d at 260. We further hold that there were reasonable alternative methods for

procuring Whisman’s testimony that the State could have pursued, but did not;

instead relying solely on its inadequate and belated attempt to subpoena Whisman

in Australia. Id. at 724, 20 L. Ed. 2d at 259-60. These alternatives included, inter

alia, simply keeping Whisman under subpoena until trial, in light of the fact that she

had been successfully served prior to 23 March 2015. (3) Neither the State nor the

trial court presented adequate justification for denying Defendant’s request to

continue the trial to a date subsequent to the end of Whisman’s deployment; further,

the trial court failed to even address this issue in its order granting the State’s motion

in limine.

 Concerning the first reason for granting a new trial, the dissenting opinion

agrees that the trial court failed to make the necessary findings of fact. See Triplett,

316 N.C. at 8, 340 S.E.2d at 740–41. However, the dissenting opinion differs with the

majority opinion concerning what, if any, remedy is thereby required.

 - 69 -
 STATE V. CLONTS

 Opinion of the Court

 Concerning the second reason, the dissenting opinion disagrees with our

holding that the State did not make a good-faith effort to obtain Whisman’s presence

at trial, focusing on steps the State took to procure Whisman for her deposition

testimony, and the fact that the State gave Defendant proper notice of its intention

to admit her deposition testimony. However, these actions are not relevant to

Confrontation Clause unavailability analysis. See Barber, 390 U.S. at 725–26, 20 L.

Ed. 2d at 260. The only action taken by the State to procure Whisman for trial was

the subpoena – non-compliant with the Code service procedures – that was mailed to

Australia shortly before the beginning of the trial, and which in all likelihood was

never served on Whisman. Although the dissenting opinion also appears to give

weight to the State’s argument that there was a possibility that Whisman could be

subject to future deployments, “the prosecution must either produce, or demonstrate

the unavailability of, the declarant whose statement it wishes to use against the

defendant.” Roberts, 448 U.S. at 65, 65 L. Ed. 2d at 607 (emphasis added) (citations

omitted). The State was required to demonstrate that proceeding to trial without the

presence of Whisman was necessary. Id. The hypothetical possibility that Whisman

might have been unavailable at some future date is insufficient to demonstrate her

actual unavailability. See Barber, 390 U.S. at 724, 20 L. Ed. 2d at 260 (“‘the

possibility of a refusal is not the equivalent of asking and receiving a rebuff’”); Nobles,

357 N.C. at 438, 584 S.E.2d at 770 (“‘[i]f there is a possibility, albeit remote, that

 - 70 -
 STATE V. CLONTS

 Opinion of the Court

affirmative measures might produce the declarant, the obligation of good faith may

demand their effectuation’”) (emphasis omitted).

 Concerning the third reason, the dissenting opinion does not address the

State’s failure to request a continuance, the State’s express resistance to Defendant’s

motion to continue, nor the trial court’s denial of Defendant’s motion to continue. The

dissenting opinion does state that “[a]ll parties knew Whisman was serving on active

duty and subject to repeated deployments[.]” While true, we do not believe the fact

that all service members may be subject to deployment at some unknown future date

renders them all “unavailable” for Confrontation Clause purposes, nor does this fact

absolve the trial court from the need to consider a continuance instead of depriving a

defendant of his constitutional right of confrontation. The Confrontation Clause

requires more than the temporary inability of a material witness to attend trial at a

certain date if the trial can reasonably be continued to a date when the witness would

likely be available. See Peterson, 344 F.2d at 425; Smith, 106 F.2d at 728;

Vanderwier, 25 M.J. at 266–67. We hold above that, in order for the State to show a

witness is unavailable for trial due to deployment, the deployment must, at a

minimum, be “in probability long enough so that, with proper regard to the

importance of the testimony, the trial cannot be postponed.” Amaya, 533 F.2d at 191.

 In conclusion, we hold that the trial court erred in allowing Whisman’s

deposition testimony to be entered into evidence in lieu of her live testimony in

 - 71 -
 STATE V. CLONTS

 Opinion of the Court

violation of both N.C. Gen. Stat. § 8C-1, Rule 804, and the provisions of the

constitutions of both the United States and North Carolina. We so hold because: (1)

the trial court failed to make the required findings of fact to demonstrate

unavailability for the purposes of Rule 804 or the Confrontation Clause; (2) the State

failed in its burden of showing Whisman could not be made present at trial “by

process or other reasonable means.” N.C. Gen. Stat. § 8C-1, Rule 804(a)(5); and (3)

the State failed in its burden of proving it had carried its constitutionally required

burden of demonstrating that it had “made a good-faith effort to obtain [Whisman’s]

presence at trial.” Barber, 390 U.S. at 724–25, 20 L. Ed. 2d at 260. We further hold

that the State has failed in its burden of proving the deprivation of Defendant’s

constitutional rights was “harmless beyond a reasonable doubt.” Van Arsdall, 475

U.S. at 684, 89 L. Ed. 2d at 687. Finally, Defendant failed to preserve appellate

review of his jury instruction argument.

 NEW TRIAL.

 Judge STROUD concurs.

 Judge Tyson dissents by separate opinion.

 - 72 -
 No. COA16-566 – State v. Clonts

 TYSON, Judge, dissenting.

 I agree with the majority’s opinion, which holds the trial court could have made

additional findings of fact to show the State made a reasonable, good faith effort to

procure Whisman’s physical presence at trial. However, the record and evidence the

State presented clearly supports the trial court’s ultimate conclusion that Whisman

was unavailable for trial.

 The majority’s opinion adds an unnecessary and burdensome weight upon the

State. Defendant failed to show any prejudicial error. At a minimum, we should

remand for further findings of fact. I respectfully dissent from the majority opinion’s

award of a new trial.

 I. Standard of Review

 While the admissibility of hearsay evidence is generally reviewed de novo,

State v. McLaughlin, __ N.C. App. __, __, 786 S.E.2d 269, 283 (2016), as the majority

notes, our Supreme Court has established a different standard when this Court is

reviewing the trial court’s determination of the availability of a witness for trial. State

v. Fowler, 353 N.C. 599, 610, 548 S.E.2d 684, 693 (2001).

 We review whether the trial court’s findings of fact are supported by the

evidence, and whether those findings support the court’s conclusions of law. See id.;

State v. Triplett, 316 N.C. 1, 8, 340 S.E.2d 736, 740-41 (1986). A trial court’s
 STATE V. CLONTS

 TYSON, J., dissenting

conclusions of law are reviewed de novo. State v. Simon, 185 N.C. App. 247, 250, 648

S.E.2d 853, 855 (2007).

 II. Unavailability of Witness

 Defendant argues the admission of Whisman’s video-taped deposition violated

his rights under the Confrontation Clause contained in the Sixth Amendment of the

Constitution of the United States. Defendant asserts the trial court erred by finding

Whisman was unavailable to testify at trial.

 A. Unavailability under the Confrontation Clause

 Our courts employ a three-step inquiry to determine whether a defendant’s

right to confront a witness has been violated: (1) whether the evidence admitted was

testimonial in nature; (2) whether the trial court properly ruled the declarant was

unavailable; and, (3) whether defendant had an opportunity to cross-examine the

declarant. State v. Clark, 165 N.C. App. 279, 283, 598 S.E.2d 213, 217 (2004); see

Crawford v. Washington, 541 U.S. 36, 68, 158 L. Ed. 2d. 177, 203 (2004).

 Defendant contends Whisman should have been produced as a witness at trial

and that the trial court improperly held Whisman was unavailable. We all agree that

Whisman’s deposition was testimonial in nature. There is also no dispute that

Defendant was present at the deposition, had the opportunity to and did, in fact,

cross-examine Whisman. Steps (1) and (3) of the inquiry are satisfied. Thus, if

Whisman was constitutionally unavailable, her prior, preserved testimony was

 2
 STATE V. CLONTS

 TYSON, J., dissenting

properly admitted. See Crawford, 541 U.S. at 68, 158 L. Ed. 2d. at 203.

 The Supreme Court of the United States and our Supreme Court have “rejected

the assumption that the mere absence of a witness from the jurisdiction was sufficient

ground for dispensing with confrontation.” State v. Nobles, 357 N.C. 433, 437-38, 584

S.E.2d 765, 770 (2003) (internal quotation marks and citation omitted); see Barber v.

Page, 390 U.S. 719, 723, 20 L. Ed. 2d 255, 259 (1968).

 The Supreme Court of the United States in Barber v. Page, noted:

 It must be acknowledged that various courts and
 commentators have heretofore assumed that the mere
 absence of a witness from the jurisdiction was sufficient
 ground for dispensing with confrontation on the theory
 that it is impossible to compel his attendance, because the
 process of the trial [c]ourt is of no force without the
 jurisdiction, and the party desiring his testimony is
 therefore helpless.

Id. (footnotes, internal quotation marks, and citation omitted). The Court in Barber

stated “increased cooperation between the States themselves and between the States

and the Federal Government has largely deprived [that assumption] of any

continuing validity in the criminal law.” Id. (footnote omitted).

 The Court also assigned a broader meaning of “unavailable” within the context

of the confrontation requirement and declared:

 In short, a witness is not “unavailable” for purposes of the
 foregoing exception to the confrontation requirement
 unless the prosecutorial authorities have made a good-faith
 effort to obtain his presence at trial.

 3
 STATE V. CLONTS

 TYSON, J., dissenting

Id. at 724-25, 20 L. Ed. 2d at 260.

 The Supreme Court also rejected the argument that just “because the State

would have had to request an exercise of discretion on the part of federal authorities,

it was under no obligation to make any such request,” and stated “the possibility of a

refusal is not the equivalent of asking and receiving a rebuff.” Id. at 724, 20 L. Ed.

2d. at 260.

 Following this line of reasoning, our Supreme Court has held:

 If there is a possibility, albeit remote, that affirmative
 measures might produce the declarant, the obligation of
 good faith may demand their effectuation. The lengths to
 which the prosecution must go to produce a witness . . . is
 a question of reasonableness. The prosecution need not
 exhaust every possible alternative for producing a witness.
 Nonetheless, to demonstrate constitutional unavailability,
 the state’s good-faith efforts must include, at a minimum,
 an attempt to contact the witness and request his or her
 presence at the proceeding.

Nobles, 357 N.C. at 438, 584 S.E.2d at 770 (emphasis original and supplied) (internal

quotation marks and citations omitted). The State must demonstrate it “attempted

in good faith to contact the potential witness, that it attempted in good faith to inquire

into her willingness and availability to testify, and that it presented the results of

this inquiry to the trial court.” Nobles, 357 N.C. at 441, 584 S.E.2d at 772. As the

trial court properly concluded, the State met that burden here.

 A. Unavailability under Rule 804

 This Court recently held:

 4
 STATE V. CLONTS

 TYSON, J., dissenting

 While it is well-established that there is “wisdom” to the
 hearsay exceptions, it is similarly settled that, while the
 Confrontation Clause and rules of hearsay may protect
 similar values, it would be an erroneous simplification to
 conclude that the Confrontation Clause is merely a
 codification of hearsay rules. Evidence admitted under an
 exception to the hearsay rule may still violate the
 Confrontation Clause.

 At the same time, the U.S. Supreme Court in Crawford did
 acknowledge that the Confrontation Clause . . . does not
 bar the use of testimonial statements for purposes other
 than establishing the truth of the matter asserted. In
 doing so, Crawford recognized that most of the exceptions
 to the hearsay rule cover statements that by their nature
 are not testimonial and, therefore, do not present a
 Confrontation Clause problem.

McLaughlin, __ N.C. App. at __, 786 S.E.2d at 276-77 (brackets, internal quotation

marks and citations omitted).

 Under Rule 804, “unavailability as a witness” includes situations where the

declarant “[i]s absent from the hearing and the proponent of his statement has been

unable to procure his attendance . . . by process or other reasonable means.” N.C.

Gen. Stat. § 8C-1, Rule 804(a)(5) (2015).

 Prior to allowing testimonial evidence to be presented under Rule 804(b), the

trial court, as it properly did here, must find the declarant is unavailable. Triplett,

316 N.C. at 8, 340 S.E.2d at 740; see Clark, 165 N.C. App. at 286, 598 S.E.2d at 218

(“The trial court must receive substantial supporting evidence before making a

finding of unavailability.”). “The proponent of the statement bears the burden of

 5
 STATE V. CLONTS

 TYSON, J., dissenting

satisfying the requirements of unavailability under Rule 804(a).” Nobles, 357 N.C. at

440, 584 S.E.2d at 771.

 Our Supreme Court has held:

 The degree of detail required in the finding of
 unavailability will depend on the circumstances of the
 particular case. For example, in the present case, the
 declarant is dead. The trial judge’s determination of
 unavailability in such cases must be supported by a finding
 that the declarant is dead, which finding in turn must be
 supported by evidence of death. See, e.g., United States v.
 Sindona, 636 F. 2d 792, 804 (2d Cir. 1980). Situations
 involving out-of-state or ill declarants or declarants
 invoking their fifth amendment right against self-
 incrimination may require a greater degree of detail in the
 findings of fact. See, e.g., Parrott v. Wilson, 707 F. 2d 1262
 (11th Cir.), cert. denied, 464 U.S. 936 (1983) (duration of
 illness was found to be long enough that trial could not be
 postponed).

See Triplett, 316 N.C. at 8, 340 S.E.2d at 741-42.

 For example, under Rule 804(a)(5) and under the Confrontation Clause, our

Supreme Court has held a witness may be deemed unavailable if: (1) the witness

moves abroad and refuses to return to the United States; (2) the State cannot find the

witness despite making a reasonable or good-faith effort to do so; or, (3) if the witness

refuses to respond to the State’s efforts to contact her. See e.g., Fowler, 353 N.C. 599,

610, 548 S.E.2d 684, 693; State v. Bowie, 340 N.C. 199, 207, 456 S.E.2d 771, 775

(1995); Clark, 165 N.C. App. at 285, 598 S.E.2d at 218-19; State v. Grier, 314 N.C. 59,

68, 331 S.E.2d 669, 675 (1985).

 6
 STATE V. CLONTS

 TYSON, J., dissenting

 C. Whisman’s Unavailability

 The trial court made the following ruling regarding Whisman’s unavailability:

 That the matter came up on motion of the State to use
 [Rule 804] testimony in the form of a video . . . of an
 indispensable witness who’s in the military. The Court
 heard argument of both sides regarding the availability or
 unavailability of said witness. The Court finds the witness
 is in the military and is stationed outside of the State of
 North Carolina currently. May be in Australia or
 whereabouts may be unknown as far as where she’s
 stationed. That the State duly and properly followed the
 procedure to preserve that witness’s testimony. That prior
 to trial her testimony was taken pursuant to an order of
 the Court and preserved in a form that allowed cross-
 examination as the defendant and the defendant’s counsel
 were present as was the prosecution. . . .

 Again, the Court heard arguments and determines that . .
 . Whisman is unavailable within the definition of the rule,
 and, therefore, the Court intends to allow introduction of
 the video if the formalities and the proper foundation are
 laid of this witness’s testimony, she being unavailable for
 this trial.

 Post hoc review, the trial court could have included further findings of fact

regarding whether the State made “good faith efforts” or used “other reasonable

means” to procure Whisman’s physical attendance at trial. See N.C. Gen. Stat. § 8C-

1, Rule 804(a)(5); Nobles, 357 N.C. at 440, 584 S.E.2d at 771.

 However, after reviewing the State’s motions, the transcript, and the evidence

presented, the record clearly demonstrates the State made reasonable, good faith

efforts to procure Whisman’s physical presence at trial to affirm the trial court’s

 7
 STATE V. CLONTS

 TYSON, J., dissenting

conclusion that Whisman was unavailable.

 All parties knew Whisman was serving on active duty and subject to repeated

deployments, including to being sent outside of the country, between February 2015

and December 2015. In March 2015, prior to Whisman’s deployment outside the

United States, the State subpoenaed Whisman, brought her to North Carolina from

California, and deposed and recorded her testimony on video. Defendant’s counsel

was noticed and present for the deposition, and was given the unlimited opportunity

to cross-examine Whisman.

 The evidence presented to the trial court demonstrates the State filed “notice

of intention to admit prior testimony” on 22 May 2015 because “the State

anticipate[d] Ms. Whisman being ‘unavailable’ for trial.” The State also filed a motion

in limine at the start of the trial on 15 June 2015, which requested the trial court to

allow Whisman’s deposition to be entered into evidence and presented at trial in lieu

of her in-person testimony.

 The State’s motion in limine asserted:

 9) Pursuant to Ms. Whisman’s obligations in service to our
 nation, she is currently assigned to provide naval support
 to a United States Marine Corps mission. See Exhibit A for
 a copy of Ms. Whisman’s military orders.

 10) Since April 2015, Ms. Whisman has been deployed out
 of the country, and she is not scheduled to return until
 December 2015.

 11) Due to the potential threat to national security

 8
 STATE V. CLONTS

 TYSON, J., dissenting

 associated with revealing such information, the United
 States Navy, in communications with the undersigned
 Assistant District Attorney (see Exhibit B) has indicated
 that it will not disclose Ms. Whisman’s whereabouts.

 12) The undersigned Assistant District Attorney was
 provided with a mailing address to send a subpoena to Ms.
 Whisman, which was sent via registered mail (see Exhibit
 C).

 The attached exhibits included two letters received from the United States

Marine Corps dated 18 February 2015 and 20 May 2015. The 18 February 2015 letter

confirmed Whisman’s deployment between February 2015 to approximately

December 2015. The 20 May 2015 letter confirmed Whisman was deployed overseas

and noted “[d]ue to the potential threat of national security, I am unable to provide

you with detailed information such as location, dates, and purpose.”

 The State received this letter prior to filing its notice of intention to admit prior

testimony. A copy of the subpoena signed on 28 May 2015 by the Assistant District

Attorney, along with a certified mail receipt and the USPS tracking information, were

also attached as Exhibit C. The subpoena has a delivery address for a U.S. Marine

Corps Base in Australia. The subpoena was mailed on 1 June 2015, more than two

weeks prior to the scheduled trial.

 Generally, a witness, as opposed to a party, who is located outside of the state

and particularly outside of the United States, is beyond the jurisdiction of the state

and cannot be compelled to return to North Carolina by subpoena, whether served or

 9
 STATE V. CLONTS

 TYSON, J., dissenting

not. As an active duty member of the armed services, Whisman could not return to

North Carolina on her own choice or volition on any given date, whether she had been

physically served with a subpoena, without the express permission by and her release

from duty by her commanding officer.

 Whisman’s undisputed overseas deployment and the U.S. Marine Corps’

refusal to disclose her exact whereabouts on national security grounds are strong

indications of her unavailability as a witness in North Carolina to support the trial

court’s conclusion of unavailability under Rule 804. Moreover, the record

demonstrates the State, in good faith, contacted the U.S. Marine Corps to confirm

Whisman’s deployment well prior to trial to seek her presence and received the 20

May 2015 letter in response. The State was provided an alternative address and sent

the subpoena to Whisman on 1 June 2015. Only after the State received the 20 May

2015 letter regarding Whisman’s overseas deployment and unknown whereabouts

did the State file the notice of intention with the court to use the video-taped

deposition. Based upon the record before us, the trial court properly concluded

Whisman was physically unavailable as a witness at trial and correctly admitted her

prior, preserved testimony to the jury at trial. See N.C. Gen. Stat. § 8C-1, Rule

804(a)(5); Nobles, 357 N.C. at 440, 584 S.E.2d at 771.

 III. Conclusion

 The State made good faith efforts to procure Whisman at trial and the

 10
 STATE V. CLONTS

 TYSON, J., dissenting

possibility of refusal of the military to comply did not relieve the State’s duty to make

such an effort. See Barber, 390 U.S. at 724-25, 20 L.Ed.2d at 260. Post hoc, while the

trial court could have made additional findings, the undisputed evidence in the record

supports the trial court’s ultimate conclusion that Whisman was unavailable.

 The State made reasonable and good faith efforts to procure Whisman’s

physical presence at trial. The State contacted the U.S. Marine Corps well in advance

of trial to inquire about Whisman’s whereabouts and received the 20 May 2015 letter

in response. The letter confirmed Whisman was deployed overseas until

approximately December 2015 and, due to national security, the U.S. Marine Corps

was unable to provide the State with her exact location. The State also produced

evidence demonstrating it sent Whisman a subpoena to the overseas address

provided to the State.

 The trial court properly found Whisman was unavailable as a witness at trial.

After unlimited opportunity to cross-examine Whisman when she was present in

North Carolina by the efforts of the State, Defendant has failed to show any

prejudicial error.

 In the alternative, the trial court’s failure make further findings of fact on the

extent of the State’s efforts to procure Whisman’s physical presence at trial does not

per se mandate a new trial. As an appellate court, we are “to determine whether the

prosecution met its burden of establishing that the witness was constitutionally

 11
 STATE V. CLONTS

 TYSON, J., dissenting

unavailable to testify.” Clark, 165 N.C. App. at 285, 598 S.E.2d at 218.

 If, after our appellate review of the evidence and findings by the trial court on

the record, this Court is unable to review the merits of Defendant’s claim, the proper

action is to remand this case to the trial court to make the further findings of fact,

and not set aside the jury’s verdict and award a new trial. I respectfully dissent.

 12